In the

# United States Court of Appeals

## For the Seventh Circuit

No. 00-4026

CHRISTIAN S. PETERS,

*Plaintiff-Appellant,*

v.

RENAISSANCE HOTEL OPERATING COMPANY,
doing business as RENAISSANCE CHICAGO
HOTEL and MARRIOTT INTERNATIONAL,
INCORPORATED,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 3990—**William J. Hibbler**, *Judge.*

ARGUED JUNE 7, 2002—DECIDED SEPTEMBER 20, 2002

Before BAUER, POSNER and RIPPLE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Christian S. Peters brought this action pursuant to 42 U.S.C. § 1981 and 42 U.S.C § 2000e et seq. against his former employer, Renaissance Hotel Operating Corp. ("Renaissance"). Mr. Peters alleged that Renaissance had subjected him to discriminatory treatment and had terminated his employment on the basis of his race and in retaliation for voicing concern on issues of diversity. The district court granted summary judgment

for Renaissance, and Mr. Peters appealed. We now affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

### 1. Employment History

Mr. Peters was employed by Renaissance as a Loss Prevention Officer ("LPO") from March 1996 to November 17, 1997; Mr. Peters typically worked the third shift. As a LPO, Mr. Peters' duties included providing for the safety and security of guests, monitoring Renaissance guest and associate activity, and working with outside agencies like the Chicago Fire Department. LPOs were supposed to record their activities in an activity log; the importance of keeping an accurate activity log was communicated to all LPOs at a departmental meeting in October 1997.

#### a. Discriminatory Treatment of Guests

Mr. Peters maintains that he began to notice discriminatory treatment toward African-American guests shortly after he began his employment. Mr. Peters points to four incidents during his employment that evidenced this discrimination. First, Mr. Peters states that LPOs were instructed to watch or follow African-American guests, but were not given similar instructions with respect to Caucasian guests. As well, a Renaissance bartender reported that an African-American man was taking money from the coin fountain; after investigation, it was determined that the report was unfounded. Furthermore, according to Mr. Peters, on at least one occasion, a party of African-American

guests was not provided with additional ice and cups, while noisier parties of Caucasian guests were moved, with hotel assistance, to public rooms and provided with additional supplies. Finally, Jeffrey Simons, a Loss Prevention supervisor,[1] referring to music being played by some African-American guests, commented that he could not wait until the "wicca wicca woo" music was turned off. R.69, ¶ 97.

### b. Discriminatory Treatment of Employees

In addition to discriminatory treatment of guests, Mr. Peters maintains that Renaissance engaged in discriminatory treatment of its employees. Mr. Peters recalls an incident in which he overheard a Caucasian LPO use the word "nigger."[2] Mr. Peters claims that he complained about this incident "up the chain of command" and, at least initially, "was told to mind his own business," R.77, ¶ 134; however, Mr. Peters also admits that the offending LPO was required to apologize to Mr. Peters and was suspended for the use of the term. The incident also prompted management to hold diversity training classes for the Loss Prevention department. *See* R.69, ¶¶ 136 and 144; R.77, ¶¶ 136 and 144.

Mr. Peters also points to other ways that African-American employees at Renaissance were subjected to different treatment. Mr. Peters states that Steve Keith, Renaissance's director of human resources, would greet Caucasian em-

---

[1] At the time of Mr. Peters' employment, the Loss Prevention department had two supervisors, James Ware and Jeffrey Simons, as well as a department director, Mark Baughman.

[2] The comment was not directed at Mr. Peters.

ployees, but did not greet Mr. Peters or another African-American LPO, Tyrone Kuehnel, in the same manner. As well, on one occasion, Simons, a supervisor, asked Milt Stroner, a Caucasian LPO, to retrieve coins from the fountain, but Mr. Peters and Kuehnel were not asked to perform this duty.

### c.   Retaliation

According to Mr. Peters, when he brought complaints to management concerning the treatment of African-American patrons and employees, he soon started to experience retaliation in response to these complaints. With one exception, Mr. Peters does not identify the specific nature of his complaints, to whom the complaints were addressed and when, in proximity to the alleged retaliation, the complaints were made. The record does reflect that, in September 1997, Mr. Peters and Kuehnel met with Anthony Stewart-Moore, the General Manager, to discuss their concerns about diversity.[3]

The first of the alleged retaliatory actions occurred in June 1996, after several Renaissance guests complained that they had not received the breakfasts that they had placed orders for the previous evening. It is the responsibility of LPOs on the night shift to pick up breakfast order cards. When Baughman confronted Mr. Peters, who had been on duty on the evening in question, Mr. Peters claimed that

---

[3]  The meeting was held in the hotel restaurant. Mr. Peters did not believe that this was the best place to hold the meeting because guests might overhear the conversation; specifically, Mr. Peters gestured to a group of Japanese guests. Stewart-Moore responded that the guests probably could not understand English anyway, and the meeting continued on in the restaurant.

he had, in fact, picked up the breakfast cards. Baughman reviewed Mr. Peters' activity log and discovered that it did not reflect time collecting the cards. Mr. Peters was counselled that he "should document on his activity log all times, actions and observations." R.77, ¶ 71. Mr. Peters also was issued a warning for failing to document his activities on his activity log: "Failure to properly document actions on the Activity Log will result in further disciplinary action and retraining." *Id.* Mr. Peters believes that he should not have been given this warning because the more generic term "touring floors," which was stated in his activity log, encompasses picking up the breakfast cards. R.77, ¶ 71.

Also early in Mr. Peters' employment, Baughman was alerted by other members of Renaissance management that unauthorized telephone calls were being charged to a telephone located in the Audio Visual Room. Baughman set up a hidden surveillance camera to determine who was making the calls. Mr. Peters was recorded on video using the telephone. Baughman again reviewed Mr. Peters' activity log to see if his log reflected his calls from the Audio Visual Room, but the log reflected no such activity. When questioned by Baughman, Mr. Peters stated that he did not recall making the calls. In a subsequent meeting with Baughman and Keith, Mr. Peters admitted making the calls, but claimed that he did not know that he could not make calls from that room. Mr. Peters received another warning for this action.[4]

---

[4] Additionally, Mr. Peters claims that, when he had enough seniority to merit his choice of days off and desired to have Thursdays and Fridays off, Baughman commented that he "would rather die" than see him get those days off. R.78, ¶ 63.

(continued...)

### d.  Events Leading to Mr. Peters' Termination

In November 1997, an employee in the national sales office ("NSO") reported to Baughman that she believed someone was entering the office after hours without authorization. As a result, an investigation was conducted, and Baughman set up a hidden camera in the office. At about 11:15 p.m. on November 12, 1997, Mr. Peters was asked by Erik Williamson, an off-duty, Caucasian LPO, if Mr. Peters would come to the NSO with Williamson and help Williamson look for computer disks containing software he needed for a Loss Prevention department project. Once in the sales office, Mr. Peters and Williamson opened drawers and closets to see if they could find what Williamson wanted. Williamson also turned on the computer and showed Mr. Peters how to access the internet. Mr. Peters and Williamson were in the sales office for about 51 minutes.

Mr. Peters' activity log, however, did not reveal any time spent in the sales office. In contrast, his log stated that he was various places performing his duties during that time period.[5] Mr. Peters later explained that he had pre-entered some of the items on the log, but had forgotten to change them later.

On November 17, 1997, Baughman and Keith met with Mr. Peters and Williamson in separate meetings and ter-

---

[4] (...continued)
Despite this comment, however, Mr. Peters does not point to any evidence of record that suggests that either he was denied days off or he was prevented from taking his choice of days.

[5] Mr. Peters' log stated that he was in the retail area, which is a general term for an area that includes the sales office, for only five minutes.

minated their employment with Renaissance. Williamson was terminated for being in the sales office while off-duty, for using the computer and for accessing the internet without authorization. Mr. Peters was terminated for being in the office for an extended time without authorization and for falsification of his activity log.[6]

---

[6] Mr. Peters claims in his brief that the termination papers make no mention of his being terminated for being in the NSO for an extended period of time without authorization; his support for this statement is, in part, the transcript of his termination meeting. The transcript, however, does not bear out Mr. Peters' characterization. In the meeting in which Keith and Baughman terminated Mr. Peters, Keith stated: "There was none [authorization] given. We've got it on camera, we were shocked to see these things. NSO told us a couple of weeks ago that stuff was missing, postage. M[ark Baughman] set up surveillance . . . . All this time there was no authorization. This goes on for 51 minutes. You had no reason to be in there." R.70, Vol. VII, Ex.28, Ex.4. Later Keith commented again on the length of time: "51 minutes . . . We're going to go look for computer discs . . . ." *Id.* Near the end of the interview, Keith says again, "I want to stress that this is not something we want to see happen. As an LPO your accountabilities are high. You had no reason to be in there. That's why we're taking this action. . . ." *Id.* Consequently, it was clear from the termination meeting that the amount of time and the issue of authorization played at least some role in the decision.

Mr. Peters also references the termination paper placed in his file. Again the amount of time and the lack of authorization were mentioned. The employee action form states:

> Chris was observed entering the NSO at approx. 11:15 p.m. Once inside the NSO, Chris was observed opening file drawers and cabinets. Chris was observed departing the NSO at approx. 12:06 a.m., or approx. 51 min. after entry. According to Chris's L.P. Activity Log, between 11:23 p.m. to

(continued...)

### 2.  Charges of Discrimination

In February 1998, shortly after his termination, Mr. Peters brought his first charge of discrimination against Renaissance, charge number 210981300. In that charge, Mr. Peters claimed that he had been terminated on the basis of his race and sex. Specifically, he charged that:

> I.  I began my employment with the above named Respondent in or about March 1996 as a Loss Prevention Officer. On November 17, 1997, I was discharged.
>
> II.  Respondent's reason for my discharge was "falsification of documents."
>
> III.  I believe I was discriminated against because of my race and sex (Black male) in violation of Title VII of the Civil Rights Act of 1964 . . . in that Respondent discharged me whereas White males and White females are not discharged for falsifying records.

R.70, Vol. III, Ex.25, Ex.3. The notice of right to sue on this charge was issued on March 31, 1998.

On June 18, 1998, Mr. Peters filed a second charge of discrimination with the EEOC, charge number 210983015.[7]

---

[6] (...continued)
11:27 p.m. Chris was touring the retail area and Kinkos (see Log). From 11:27 p.m. to 12:02 a.m. Chris was in the Hotel lobby monitoring guest and associate activity (see Log). This is a violation of work rule #4, Falsification of employment or time records . . . or other hotel records, and #19, using hotel . . . Facilities for purposes other than hotel business without authorization.

R.70, Vol. IV, Ex.25, Ex.38.

[7] At the same time, Mr. Peters sought to amend his first charge to include the allegations set forth in his second charge. It is
(continued...)

In this second charge, Mr. Peters claimed that he had suffered retaliation, including retaliatory termination, as a result of his protesting to management the discriminatory treatment of African-American guests and employees. *See* R.76, Ex.A. Mr. Peters received a notice of the right to sue for this charge on June 30, 1998.

## B.  District Court Proceedings

Mr. Peters filed his initial complaint in the district court on June 29, 1998. His complaint contained two substantive counts—discriminatory termination and hostile work environment—brought pursuant to 42 U.S.C. §§ 1981 and 2000e et seq. Mr. Peters later amended his complaint to correct the names of the parties. *See* R.30. On March 10, 2000, Mr. Peters moved for leave to file a second amended complaint that included a count (Count I-A) of retaliation. The court granted Mr. Peters' motion on March 23, 2000.

Both parties engaged in substantial discovery, and, after the discovery period closed, Renaissance moved for summary judgment on all counts. Specifically, Renaissance maintained that some of Mr. Peters' claims could not be considered by the court because they had occurred over 300 days prior to the date on which he filed his first charge of discrimination with the EEOC, February 4, 1998. In addition, Renaissance argued that Mr. Peters' § 1981 claims were barred by a two-year statute of limitations. With respect to both Mr. Peters' hostile work environment claim and his retaliatory discharge claim, Renaissance

---

[7] (...continued)
undisputed that the EEOC had completed its proceedings and had issued a right-to-sue letter on the first charge prior to the time that the amended charge was sent.

urged that the claims were procedurally barred because they are outside the scope of the charge of discrimination on which Mr. Peters rested his complaint. Finally, Renaissance argued that Mr. Peters could not establish a prima facie case of discriminatory discharge or, alternatively, could not establish pretext.

After receiving the briefs and materials from all parties, the court ruled in favor of Renaissance. First, the court agreed with Renaissance that any claims that occurred more than 300 days prior to his charge of discrimination were barred. The court recognized, however, that these incidents may constitute relevant background evidence for determining Renaissance's intent in terminating Mr. Peters' employment. Second, the court held that Illinois' two-year statute of limitations for personal injury actions applied to Mr. Peters' § 1981 claims. Specifically, the court found that 28 U.S.C. § 1658, the federal four-year statute of limitations, did not apply to § 1981 claims because § 1981 was enacted prior to December 1, 1990, the effective date of § 1658. Consequently, Mr. Peters' § 1981 claims were time barred. Third, the court agreed that Mr. Peters could not proceed on claims that were outside the scope of the original charge. Finally, turning to the merits of the discriminatory discharge claim, the court found that Mr. Peters had failed to make out a prima facie case of discrimination. The court determined that

> [i]n this case, it is abundantly clear that Plaintiff failed to satisfy Defendant's legitimate expectations. Almost immediately after his probationary status ended, Plaintiff was written up for falsifying documents. Then two months later, Plaintiff was given a final warning for unauthorized phone calls and falsifying documents. Then, Plaintiff was terminated for entering the National Sales Office without permission, and once again falsifying documents.

R.100 at 12. In the alternative, the district court determined that Mr. Peters had not established pretext.

The district court then held that Mr. Peters had not come forward with any evidence of a causal connection between his termination and his meeting with the general manager two months earlier; this lack of evidence doomed his retaliation claim. As well, the court rejected Mr. Peters' claim of hostile work environment and found that "[i]t can hardly be said that the harassment Plaintiff endured was sufficiently severe or pervasive to alter his employment." *Id.* at 16. Consequently, the district court entered judgment in favor of Renaissance, and Mr. Peters timely appealed.

## II

## ANALYSIS

### A.  Statute of Limitations

Mr. Peters first submits that the district court erred in holding that Illinois' two-year statute of limitations for personal injury actions, as opposed to the federal four-year statute of limitations set forth in 28 U.S.C. § 1658, applied to his § 1981 claims. Specifically, Mr. Peters explains that 28 U.S.C. § 1658 provides that "a civil action arising under an Act of Congress enacted after the date of enactment of this section may not be commenced later than four years after the cause of action accrues." 42 U.S.C. § 1658(a).[8]

---

[8] On July 30, 2002, Congress amended § 1658 by designating the quoted language as subsection (a) and adding subsection (b) which provides:

> Notwithstanding subsection (a), a private right of action that involves a claim of fraud, deceit, manipulation, or contriv-
> (continued...)

Mr. Peters acknowledges that § 1981 was enacted well before § 1658. However, he maintains that his claims do not "arise under" § 1981 as it existed when § 1658 was adopted, but arise under the amendments to § 1981 contained in the Civil Rights Act of 1991.

Historically, courts interpreted § 1981 to allow recovery for discrimination occurring during the employment relationship. However, in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), the Supreme Court determined that § 1981 was not so broad; its prohibition against discrimination in the "mak[ing] and enforc[ing]" of contracts applied only to "conduct at the initial formation of the contract and [to] conduct which impairs the right to enforce contract obligations through legal process." *Id.* at 185. Congress quickly "overruled" *Patterson* with the passing of the 1991 Civil Rights Act. In that legislation, Congress added a subsection to § 1981 that defined "make and enforce contracts" broadly enough to encompass discrimination that occurs during, and at the end of, the employment relationship.

Mr. Peters argues that post-*Patterson* § 1981 claims that rely on this broader definition of "make and enforce" could

---

[8]  (...continued)

ance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of—

(1) 2 years after the discovery of the facts constituting the violation; or

(2) 5 years after such violation.

Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204 § 804(a), 116 Stat. 745, 801 (2002). Nothing in the amendment affects the language of now subsection (a).

not have been brought prior to the passage of the 1991 Civil Rights Act and therefore "arise under" that act for purposes of § 1658. His § 1981 claim, therefore, is governed by § 1658's four-year statute of limitations.

We recently had the occasion to consider and resolve this very issue in *Jones v. R.R. Donnelley & Sons, Co.*, No. 01-3271 (7th Cir. September 16, 2002). In *Jones,* we reviewed the history of § 1981 and determined that claims, such as those brought by Mr. Peters, arose both under the original § 1981 as well as § 1981(b). Consequently, the district court did not err in applying that statute of limitations and barring Mr. Peters' § 1981 claims which arose more than two years prior to Mr. Peters' filing his complaint.[9]

## B. Title VII Discriminatory Discharge

Mr. Peters argues that the district court erred in granting summary judgment on his discriminatory discharge claim. Mr. Peters maintains that he established that he was meeting Renaissance's expectations, that Caucasian employees were treated more favorably than he was, and that Renaissance's decision to terminate his employment was pretextual. We review the district court's grant of summary judgment de novo. *See Gordon v. United Air Lines, Inc.*, 246 F.3d 878, 885 (7th Cir. 2001).

Because Mr. Peters does not have direct evidence that his discharge was discriminatory, we evaluate his claim under the familiar burden-shifting analysis. In order to es-

---

[9] The application of the two-year statute of limitations to Mr. Peters' retaliation claim will be discussed in greater detail in Part C of this opinion.

tablish a prima facie case of discrimination, Mr. Peters must show that (1) he is a member of a protected class; (2) at the time of his discharge, he was meeting his employer's legitimate expectations; (3) he was discharged; and (4) his employer treated similarly situated individuals outside of the protected class more favorably. *See, e.g., Gonzales v. Ingersoll Mill Mach. Co.*, 133 F.3d 1025, 1032 (7th Cir. 1998). If Mr. Peters meets this burden, the burden of production then shifts to Renaissance to articulate a legitimate nondiscriminatory reason for its action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Peeley v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). Assuming Renaissance meets this burden, the burden shifts back to Mr. Peters to show that the reason set forth by Renaissance was not its true reason, but a pretext—"a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000).

There is no dispute that Mr. Peters is a member of a protected class and that he was discharged. With respect to the second prong—meeting Renaissance's expectations, Mr. Peters points to the fact that he was given a satisfactory performance evaluation at the review preceding his termination and that he received the LPO of the month award in September 1997. However, the question is not whether at any time in Mr. Peters' employment he was meeting his employer's expectations; the question is whether he was meeting his employer's expectations at the time he was terminated. *See Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991). At the time of his termination, Mr. Peters had spent nearly an hour in the NSO, had used equipment without permission and, despite having received repeated warnings concerning the necessity of properly documenting his activity, had failed to identify his whereabouts on his activity log.

Especially given the responsibility of LPOs to monitor guest and associate activity, Mr. Peters was not performing his duties to Renaissance's satisfaction at the time of his termination.

Mr. Peters also contends, in the alternative, that he should not be held to the "meeting expectations" requirement. Specifically, Mr. Peters concedes that he violated Renaissance rules with his actions in the NSO and with respect to his activity log. In such circumstances, he posits, the proper inquiry is not whether he was meeting Renaissance's legitimate expectations, but whether he was treated more harshly than other individuals who broke the same rules. Mr. Peters relies upon *Flores v. Preferred Technical Group*, 182 F.3d 512 (7th Cir. 1999), in support of his argument.

In *Flores*, several employees, including Flores—a Hispanic, had staged a protest concerning a new break policy. However, only Flores was terminated for the incident. In considering whether Flores had made out a prima facie case of discriminatory discharge, this court stated that

> [i]t makes little sense in this context to discuss whether she was meeting her employer's reasonable expectations. . . . PTG could have fired any or all of [the offending employees]. The issue in this case is whether Flores was singled out for discipline because she is Hispanic. Therefore, under the facts of this case, Flores does not have to show that she was meeting her employer's legitimate expectations in order to establish a *prima facie* case of discriminatory discharge.

*Id.* at 515.

Mr. Peters, however, was not "singled out for discipline" as the plaintiff was in *Flores*. Mr. Peters and Erik Williamson were both LPOs. Neither had authorization to be in the

NSO, to look through drawers or to use the computer. Both were terminated as a result of their activities. Mr. Peters is African-American; Williamson is Caucasian. Mr. Peters was not singled out for this punishment on account of his race, and he has not established a prima facie case of discriminatory termination.

In his reply brief, Mr. Peters argues that he should not be compared to Williams, but to other LPOs who also have altered their activity logs at some point during their employment and have not been terminated. The burden is on Mr. Peters to establish the similarity between himself and the proposed comparable employees. *See Radue v. Kimberly-Clark*, 219 F.3d 612, 618 (7th Cir. 2000). Specifically,

> in disciplinary cases—in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason—a plaintiff must show that he is similarly situated with respect to performance, qualifications and conduct. This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.

*Id.* at 617-18 (internal citations omitted). In the present case, Mr. Peters has come forward with a list of the individuals who allegedly falsified their activity logs or other documents but were not disciplined or discharged for their activities. *See* Appellant's Br. at 34-35. However, even if Mr. Peters' allegations concerning these individuals' activities are true, their conduct is not comparable to that of Mr. Peters. Mr. Peters does not point to any LPO who, like Mr. Peters, had been warned on multiple occasions

about keeping an accurate activity log, whose activity log reported inaccurate activity for nearly an hour during one shift and who, in conjunction with that inaccuracy, was engaging in unauthorized activity that was itself violative of company rules. Furthermore, Mr. Peters ignores the fact that it was only after this egregious incident concerning his unauthorized entry into the NSO in conjunction with the falsification of his log that his employment was terminated; prior failures to maintain accurately his log resulted only in warnings. Consequently, we do not believe that Mr. Peters has met his burden of identifying similarly situated individuals who were treated more favorably than he was.[10]

---

[10] In addition to the lack of similarities noted above, we believe Mr. Peters' proposed comparisons suffer from other infirmities. Mr. Peters first maintains that LPO Mark Bosch falsified another employee's activity log, but was not disciplined. In support of this statement, Mr. Peters points to his statement of additional facts submitted to the district court, which in turn cites the deposition of Steven Keith, former human resources director for Renaissance. *See* R.78, ¶ 14. However, a look at Keith's testimony does not suggest Bosch and Mr. Peters engaged in the same type of behavior. Keith's testimony centered on the departure of another LPO, Ellen Carlson, and interviews that Keith conducted with LPO management and staff immediately following her departure. These interviews revealed that Carlson had on-going problems with Bosch, that Bosch identified Carlson as "it" on the Loss Prevention board, that she believed that he had changed her log entries, and that he had "scribbled" things in her log. R.70, Vol. VII, Ex.28, Ex.9. According to Keith's testimony, "Ellen felt that Mark Bosch was playing games with her." *Id.*, Ex.28 at 67. Concerning the alleged falsification, he stated: "All I do recall is that she said something about Mark Bosch scribbling comments on her

(continued...)

---

[10] (...continued)
log and writing comments on the board about her, but I don't recall exactly whether this had anything to do with changing her log entries." *Id.* Keith further testified that he requested Mark Baughman, director of the Loss Prevention department, to look into the matter, but that he did not recall what the outcome of Baughman's investigation had been. *See id.* at 68. Mr. Peters does not point to any other place in the record that confirmed that Bosch had "falsified" Carlson's logs or that Bosch had not been disciplined for such activity. Therefore, there is no competent testimony or other admissible evidence that a "falsification" occurred or that Bosch had not been disciplined for his actions, and it is not the responsibility of this court to ferret through the record for support for Mr. Peters' arguments. *See Colburn v. Trs. of Ind. Univ.*, 973 F.2d 581, 593 (7th Cir. 1992) (stating that parties "cannot leave it to this court to scour the record in search of factual or legal support for this claim").

Mr. Peters also points to an alleged falsification by LPO Kelly Prosser. According to Mr. Peters, Prosser was on a lengthy personal telephone call, but her log reflected that she was in the lobby. Furthermore, although Mr. Peters brought this to Baughman's attention, no disciplinary action was taken against Prosser. To support this allegation, Mr. Peters cites his additional statement of facts to the district court, R.78, which in turn cites various forms of his own testimony and a letter written by his counsel. Although Mr. Peters may believe that Prosser was not disciplined, he does not establish by affidavit or testimony that he would have been a party to the discipline of Prosser, nor does he cite to any other competent testimony that Prosser was not disciplined about the incident, a requirement for defeating Renaissance's motion for summary judgment. *See Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999) ("In opposition to the defendants' motions for summary judgment, Stagman cannot rely upon statements in Morgan's affi-
(continued...)

---

[10] (...continued)
davit that fail to meet the requirements set forth in Federal Rule of Civil Procedure 56(e). Specifically, Rule 56(e) states that '[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.' Thus, statements outside the affiant's personal knowledge or statements that are the result of speculation or conjecture or merely conclusory do not meet this requirement.").

Mr. Peters also identifies an incident that allegedly occurred on February 10, 1998, nearly three months after Mr. Peters was terminated. According to the affidavit of LPO Levi Reed, Reed observed another LPO, Greg Radke, drinking an "unknown beverage" in the cafeteria at 7:25 a.m.; Radke's log, however, stated that he was inspecting floors from 7:02 to 8:00 a.m. *See* R.76, Ex.F, Ex.A at 1, 4. Radke's log does appear to report something about touring floors; the copy of that log in the record is, in large part, unreadable. *See id.*, Ex.A at 4. However, this allegation concerning Radke is similar to that concerning Prosser. Neither Mr. Peters nor Reed states in his affidavit that they would have been privy to discussions with Radke concerning the inaccuracy in his log. Furthermore, Mr. Peters does not establish through competent evidence that Radke was not counselled or disciplined about failing to document his activities fully on his activity log.

Finally, Mr. Peters points to an incident involving LPO Milt Stroner in which Stroner's log apparently stated that he was on rounds when he actually was in the Loss Prevention office eating his meal; Stroner was not disciplined for this action. Mr. Peters' support for this assertion is his affidavit, R.76, Ex.C, ¶ 7; Exhibit "O" to that affidavit; and General Manager Anthony Stewart-Moore's deposition, R.70, Vol. VII, Ex.29 at 70. Although Mr. Peters may competently testify to what he observed and

(continued...)

Finally, Mr. Peters takes issue with the district court's determination that he did not establish pretext. Specifically, he maintains that the district court failed to scrutinize sufficiently Renaissance's rationale for terminating his employment, as instructed by the Supreme Court in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000).

*Reeves* and cases from this circuit interpreting *Reeves* have reiterated the proposition that a district court may look behind an employee's performance or disciplinary record to determine if they represent the employer's honest assessment of the employee's conduct. *See Reeves*, 530 U.S. at 144-47; *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 893 (7th Cir. 2001). In other words, a court does not have to "take an employer at its word"; if "good reason and common sense" belie the employer's assessment, then pretext may have been shown. *Gordon*, 246 F.3d at 889. However, the burden of demonstrating pretext is on the plaintiff who must show that "the employer's proffered reasons are factually baseless, were not the actual motiva-

---

[10] (...continued)
what he observed the log to report, he has not averred in his deposition that he is competent to testify concerning any discipline or counseling that Stroner would have received for this discrepancy. Exhibit "O", which concerns a customer's complaint, does not speak to the issue of Stroner's discipline; furthermore, Mr. Peters admitted in the district court that it was inadmissible. *See* R.93 at 8. Finally, Stewart-Moore's deposition concerns only Mr. Peters raising the issue of Stroner with Stewart-Moore; it does not speak to any discipline that followed from the incident. Consequently, Mr. Peters did not present admissible evidence that established that Stroner had not been disciplined for his actions.

tion for the discharge in question, or were insufficient to motivate the discharge." *Id.* at 888-89. Mr. Peters has not met this burden. First, Renaissance's proffered reason is not factually baseless. Renaissance caught Mr. Peters and Williamson on video rummaging through the NSO for 51 minutes; Mr. Peters' activity log made no mention of his activities—indeed it specifically stated that he was elsewhere during this time period. Second, Mr. Peters has not cast doubt that the events of November 12 were not the "actual motivation" for his discharge. Mr. Peters attempts to show that management harbored ill will toward him[11] and that other employees were treated more leni-

---

[11] Relying on the affidavit of Jamie Ware, Mr. Peters argues that a statement allegedly made by Baughman in August 1996 suggests that Baughman was looking for a reason to terminate Mr. Peters. Specifically, at that time, the Loss Prevention department recently had acquired a hidden camera. According to Ware's affidavit, Baughman stated, "we can set up Chris Peters and get him Peters out of here." R.76, Ex.E at 7. Putting aside Renaissance's argument that the affidavit should be stricken because it contains information and allegations that should have been revealed during the course of discovery, *see* R.89 at 3-4; Appellee's Br. at 17-18; *Harris v. Owens-Corning Fibreglass Corp.*, 102 F.3d 1429, 1433 (7th Cir. 1996) (refusing to require district court to consider affidavit submitted nine months after the discovery deadline had passed), we believe that the alleged statement in August 1996 simply is not relevant to Mr. Peters' termination in November 1997 for several reasons. First, there is no temporal proximity between the remark and the termination. *See Conley v. Vill. of Bedford Park*, 215 F.3d 703, 711 (holding that allegedly discriminatory statements made two years prior to failure to promote were "too distant temporally to provide support" for that claim). Second, the decision to terminate Mr. Peters was made by Keith and Stewart-

(continued...)

ently than he with respect to similar violations of the rules. However, there is no evidence that management tried to bait or trap Mr. Peters into entering the NSO or falsifying his activity log. And, as demonstrated above, there were no employees who engaged in actions similar to Mr. Peters yet were not terminated. Indeed, the fact that Williamson was terminated at the same time strongly suggests that the activity of the two LPOs in the NSO motivated the terminations.

Finally, Mr. Peters cannot establish that his actions in the NSO, combined with the falsification of his log, were not sufficient to motivate the discharge. LPO Williams, a Caucasian, was terminated merely for being in the NSO and using the equipment without authorization; not only did Mr. Peters engage in the same activity, he compounded his violations by failing to report his whereabouts in his activity log. Consequently, we do not believe that Mr. Peters has met his burden of showing pretext.

---

[11] (...continued)

Moore. *See* R.69, ¶ 292; *Mateu-Anderagg v. Sch. Dist. of White-fish Bay*, No. 01-3674, 2002 WL 1962222, at *6 (7th Cir. Aug. 26, 2002) (Ripple, concurring) ("Simply put, when an individual plays no role in an adverse employment action, his discriminatory animus generally proves irrelevant concerning the motivation behind the employer's employment decisions."). Finally, the remark may demonstrate hostility between Baughman and Mr. Peters; however "all dislike is not based on race." *Pilditch v. Bd. of Educ. of Chi.*, 3 F.3d 1113, 1119 (7th Cir. 1993). Baughman's alleged remark is not focused on Mr. Peters' race and, Mr. Peters' "[m]ere subjective belief[] . . . —without the backing of hard evidence—cannot prove that an action was inspired by improper motivations." *Id.*

## C. Retaliation

Mr. Peters next maintains that the district court erred in granting summary judgment to Renaissance on his retaliation claim.[12] He believes the district court erred in concluding that his retaliation claim was outside the scope of his original charge of discrimination and that he failed to establish the elements of his retaliation claim. We consider Mr. Peters' arguments below.

As noted above, the district court held that Mr. Peters' retaliation claim was outside the scope of his original charge of discrimination. Because Mr. Peters' retaliation claim was not part of this charge, and because the original charge was the basis for his proceeding in court, the district court determined that Mr. Peters should not be allowed to proceed on his retaliation claim.

Mr. Peters maintains that the district court took too narrow of a view of his original charge. Alternatively, he urges that the district court should have viewed his second charge of discrimination as curing any procedural defect.

"Generally a plaintiff may not bring claims under Title VII that were not originally brought among the charges to the

---

[12] Mr. Peters' charge of retaliation alleges that he was subjected to retaliation in three ways: he was denied his choice of days off; Renaissance management did nothing to stem the tide of a rumor that Mr. Peters had been seen kissing a Caucasian employee; and he was terminated. In his opposition to Renaissance's motion for summary judgment, Mr. Peters' arguments were limited to his discharge. *See* R.75 at 10-11. Mr. Peters does not contest this characterization of his claims in his reply brief. Because Mr. Peters' arguments to the district court were limited to his allegedly retaliatory discharge, we similarly limit our discussion in this appeal.

EEOC." *Harper v. Godfrey Co.*, 45 F.3d 143, 147-48 (7th Cir. 1995). This rule both "afford[s] an opportunity for the EEOC to settle the dispute between the employee and employer and put[s] the employer on notice of the charge against it." *Id.* at 148. Nevertheless, this court has allowed plaintiffs to proceed on claims not explicitly set forth in a charge of discrimination if the claim is " 'like or reasonably related' to the EEOC charges," and the claim in the complaint "reasonably [could] be expected to grow out of an EEOC investigation of the charge[]." *Id.* (citations omitted). For purposes of this standard, "[t]he claims are not alike or reasonably related unless there is a factual relationship between them. This means that the EEOC charge and the complaint must, at minimum, describe the *same conduct* and implicate the *same individuals.*" *Id.* (internal quotation marks and citations omitted).

In his first charge of discrimination, Mr. Peters alleged only the following:

> I. I began my employment with the above named Respondent in or about March 1996 as a Loss Prevention Officer. On November 17, 1997, I was discharged.
>
> II. Respondent's reason for my discharge was "falsification of documents."
>
> III. I believe I was discriminated against because of my race and sex (Black male) in violation of Title VII of the Civil Rights Act of 1964 . . . in that Respondent discharged me whereas White males and White females are not discharged for falsifying records.

R.70, Vol. III, Ex.25, Ex.3. We do not believe that Mr. Peters' retaliation claim is like or reasonably related to this discrimination charge. Critical to a prima facie case of retaliation is that the plaintiff engaged in protected activity, such as the filing of a charge of discrimination or other

complaint of discriminatory activity. *See Stone v. City of Indianapolis Pub. Util.*, 281 F.3d 640, 642 (7th Cir. 2002), *petition for cert. filed*, 71 U.S.L.W. 3093 (U.S. June 28, 2002) (No. 02-16). However, the charge makes no mention of a complaint of discrimination, to whom the complaint was made or what adverse action allegedly resulted from the complaint. Furthermore, although given the option to check the box on the charge form indicating retaliation, Mr. Peters did not do so. Keeping in mind that one of the purposes of the charge is to alert the employer to the offending behavior, we believe that Mr. Peters' failure to mention any type of protected activity and his failure to identify retaliation as a basis for his charge preclude him from relying on the original charge of discrimination as a basis for his retaliation claim.

The question then becomes whether the district court should have evaluated Mr. Peters' retaliation claims in relation to the second charge of discrimination. Renaissance argues that any claims based upon this later charge are procedurally barred. Renaissance points to the fact that the right-to-sue letter for the second charge issued on June 30, 1998. However, Mr. Peters did not add a claim of retaliation to his complaint until March 2000, when he filed his second amended complaint. Because Mr. Peters did not act on his right-to-sue letter within 90 days after receipt, Renaissance continues, Mr. Peters' claim of retaliation is time-barred. *See* 42 U.S.C. § 2000e-5(f)(1).

Mr. Peters acknowledges that his retaliation claim was not presented in a complaint before the district court until almost two years after he received his right-to-sue letter on that charge. However, Mr. Peters argues that our decision in *Perkins v. Silverstein*, 939 F.2d 463, 470 (7th Cir. 1991), prevents us from imposing a procedural bar in these circumstances. We respectfully disagree. In *Perkins*,

the plaintiff had filed a charge of discrimination and, before a right-to-sue letter issued on that charge, brought suit. This court held that, although facially deficient and subject to dismissal prior to the issuance of the right-to-sue letter, once the letter issued, that defect was cured. *See id.* at 471. In this case, however, Mr. Peters did not "jump the gun" and file his retaliation action prior to receiving his right-to-sue letter. By contrast, when the EEOC issued Mr. Peters a right-to-sue letter on his retaliation charge, his complaint did not contain any allegations of retaliation. Far from "jumping the gun" and filing before he had his right-to-sue letter in hand, Mr. Peters failed to act on his right-to-sue letter until almost two years after it was issued by the EEOC, well outside the statutory 90-day period. Consequently, because Mr. Peters did not proceed in a timely manner on his second right-to-sue letter, his second charge of retaliation cannot provide a basis for the retaliation claim in his complaint. We, therefore, find no error in the district court's dismissal of Mr. Peters' retaliation claim.[13]

---

[13] It appears from Mr. Peters' second amended complaint that his cause of action for retaliation is based on both Title VII and § 1981. Section 1981 claims are not subject to the same charge-filing requirements as Title VII claims, *see Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164 (1976), and the statute of limitations for § 1981 actions is not tolled while related Title VII claims are pending with the EEOC, *see Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454 (1975). Consequently, Mr. Peters' § 1981 retaliation claim must have been brought within two years of the alleged retaliation. *See supra* Part A. Mr. Peters did not meet this deadline. Renaissance terminated Mr. Peters' employment in November 1997; however, Mr. Peters did not seek to add a retaliation claim to his complaint until March 2000,

(continued...)

### D.  Hostile Work Environment

Mr. Peters maintains that the district court erred in granting summary judgment on his hostile work environment claim. Mr. Peters contends that the district court erred in failing to consider events that took place more than 300 days prior to his filing his charge of discrimination. Mr. Peters also believes that the district court erred in holding that his charges of discrimination did not fairly encompass his hostile work environment claim. Finally, Mr. Peters believes that the district court erred on the merits of his claim: The events he set forth show a severe and pervasive pattern of harassment on the basis of his race.

We see no need to parse through Mr. Peters' procedural arguments because, even if there were no procedural hurdles to prevent us from considering this claim, Mr. Peters cannot, as a matter of law, establish a hostile work environment. "In order to survive summary judgment on a hostile work environment claim, a plaintiff must present evidence that would establish that the allegedly hostile conduct was so severe or pervasive as to create an abusive working environment in violation of Title VII." *Russell v. Bd. of Trs. of the Univ. of Ill. at Chi.*, 243 F.3d 336, 342-43 (7th Cir. 2001). In determining whether the conduct is sufficiently severe or pervasive to be actionable, a court will look at all of the circumstances, includ-

---

[13] (...continued)
well outside the two-year statute of limitations. Consequently, Mr. Peters' § 1981 retaliation claim is time-barred.

Because we dispose of Mr. Peters' retaliation claims on these procedural bases, we have no occasion to address the merits of those claims.

ing "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 343 (internal quotation marks and citations omitted).

Evaluating Mr. Peters' incidents against this standard, a reasonable jury could not conclude that the events were sufficiently severe or pervasive to constitute a hostile work environment. First, many of the actions that Mr. Peters identifies were not directed at him: the comments of Jeff Simons, an LPO supervisor, "referr[ing] to black music as 'wicka wicka woo music,'" R.69, ¶ 97; a bartender's request to investigate an African-American guest who was allegedly stealing coins from a fountain; other African-American guests being denied additional ice and cups for a party; and one incident when Stroner used the word "nigger" in Mr. Peters' presence. As "second-hand" harassment, the impact of these incidents are "obviously not as great as the impact of harassment directed at the plaintiff." *Russell*, 243 F.3d at 343 (internal quotation marks and citations omitted).[14]

Indeed, Mr. Peters points only to three items that were directed towards or involved him: 1) Simons asked Stroner, a Caucasian LPO, to carry money out of the fountain when Mr. Peters and Kuehnel also were present and able to carry the money; 2) Keith, the human resources director, failed to say hello to Mr. Peters or Kuehnel; and

---

[14] The last comment, of course, is highly offensive; however, this comment was made only once, it was made by a co-worker as opposed to a supervisor, *see Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("[A] supervisor's use of the term impacts the work environment far more severely than use by co-equals."), and management suspended the employee involved.

3) when Renaissance held diversity training for its employees, interracial strife was revealed. These events, even in conjunction with the isolated, indirect incidents noted above, are not so severe or pervasive to be considered "abusive." Offensive and insensitive conduct was infrequent—Mr. Peters points only to six incidents in the year and a half he was employed by Renaissance. With the exception of the one comment by Stroner, which was not directed at Mr. Peters, the conduct complained of was only mildly offensive. Mr. Peters simply has not presented actions or comments, which by virtue of their frequency or severity, rise to the level of a Title VII violation. *Cf. Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1046-47 (7th Cir. 2002) (reversing summary judgment for defendant on hostile work environment claim where plaintiff was subjected to direct and highly offensive racial epithets by both coworkers and supervisors, where coworkers openly advocated the Klu Klux Klan and "White Power," and where there was racially offensive graffiti on the bathroom walls).

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*