In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-2502

MCKINLEY LAMBERT,

*Plaintiff-Appellant,*

*v.*

PERI FORMWORKS SYSTEMS, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 C 6789—**Sharon Johnson Coleman**, *Judge.*

ARGUED APRIL 3, 2013—DECIDED JULY 24, 2013

Before POSNER, WOOD, and HAMILTON, *Circuit Judges.*

WOOD, *Circuit Judge.* Peri Formworks Systems, Inc., is a supplier of concrete forms used in the construction of high-rise buildings, tunnels, and bridges. McKinley Lambert was employed as a laborer at one of Peri's distribution yards. While working there, Lambert claims, his co-workers and supervisors regularly made sexually and racially offensive comments. He complained regularly, but his supervisors took no action. Despite

the constant harassment, Lambert performed well and was promoted to a lead position. One day, however, Lambert's supervisors observed him behaving in an unusually aggressive manner. Concerned, they ordered him to take a drug and alcohol test, which revealed that he was intoxicated. Peri sacked him immediately pursuant to its policy of "no tolerance" for employees consuming alcohol on the job (an important policy, Peri points out, for safety in a yard where workers operate heavy machinery and maneuver large concrete objects).

Lambert did not believe that his firing was prompted by his intoxication. Instead, he attributed Peri's decision to terminate his employment to racial discrimination and retaliation for his complaints about sexual and racial harassment. He brought this suit, but the district court granted summary judgment in favor of Peri on all claims. We agree with the district court's conclusion that there is insufficient evidence that Lambert's race had anything to do with Peri's decision to test him for intoxication or to fire him. But we find that the court acted prematurely in dismissing Lambert's claims of sexual and racial harassment: there are facts in the record, viewed favorably to Lambert, upon which a jury could find that he was subjected to a hostile work environment on account of race or sex, and that he took all necessary steps to call his treatment to the company's attention. We therefore return this case to the district court for further proceedings.

**I**

In September 2003, Lambert, who is African-American, began working as a general yard worker at Peri's facility in Calumet Park, Illinois. Yard workers handle shipments of inventory to and from construction companies, and they inspect, repair, and organize concrete forms and scaffolding. They report to yard leads, who instruct and organize teams of yard workers; yard leads report to the yard manager, who oversees the yard, ensuring that trucks are loaded correctly and that shipments leave the yard in time. The logistics manager oversees all operations at the facility. Lambert was a yard worker from 2003 until January 2007. During that time, Jesus Santiago was Lambert's yard lead, and Robert Wallace was the logistics manager. In January 2007, Santiago promoted Lambert to a yard lead position.

Lambert maintains that throughout the time he worked at Peri, a co-worker, Hugo Robledo, would regularly "tell[] Lambert to suck his penis and to give him his ass, say[] Lambert had a beautiful ass, touch[] Lambert's buttox, star[e] at Lambert's genitals, spy[] on Lambert in the bathroom, expos[e] his penis to Lambert, and rub[] and grab[] his own body in a sexual manner while so close to Lambert that he often would be touching or bumping into Lambert." Lambert complained to Santiago and another yard lead, Redalfo Avila, about Robledo's offensive behavior on multiple occasions between 2004 and 2007, but neither of them took any action. Before May 2005, Peri had no written sexual harassment policy. In May 2005, it added one to its em-

ployee handbook. The policy instructed employees either to report sexual harassment to Tami Osheroff, Peri's human resources manager (located off-site at the head office in Maryland), or to write to the company's CEO. Lambert did neither.

During the same period, Wallace referred to yard laborers as "donkeys" on at least five occasions, and he called an African-American co-worker a "gorilla" in April 2007. Lambert understood the term "donkeys" to be an epithet for minority laborers. In addition, a maintenance supervisor, Serge Berger, told Lambert that Berger did not respect him because he is a "nigger." Lambert complained to Wallace about these comments in April 2007, but Wallace took no action.

On the morning of May 3, 2007, Wallace and Santiago observed Lambert behaving unusually. Lambert admits that he lifted up a co-worker while they were joking about a boxing match. According to Wallace, Lambert was speaking loudly; Santiago noticed that Lambert's eyes were glassy and he was avoiding eye contact. Santiago and Wallace called Osheroff to ask whether they had cause to test Lambert for drugs and alcohol under Peri's "reasonable suspicion" policy, which permits testing if an employee displays erratic behavior or other signs of intoxication. Osheroff spoke with Lambert on the telephone, and she confirmed that Wallace and Santiago's observations supported a reasonable suspicion of intoxication. After Santiago informed Lambert that he would be tested, Lambert purchased five cups of coffee, consumed them all on

the way to the testing facility, and asked Santiago to stop so that he could use the restroom. Notwithstanding this impressive liquid intake, Lambert's test revealed that he had a blood alcohol level of 0.10%. Lambert was immediately fired pursuant to Peri's policy of "no tolerance" for drugs and alcohol on the job.

In June 2007, a month after he was fired, Lambert sent a letter to Peri's corporate headquarters. The letter raised a number of complaints about Peri: it rehearsed the sexual and racial comments described above; it accused Wallace of violating Peri's inventory protocols and misappropriating petty cash; and it asserted that some Peri employees were not authorized to work in the United States. This letter appears to be Lambert's first effort to complain of sexual or racial harassment to anyone in Peri's headquarters, including Osheroff.

Lambert later filed this suit alleging racial and sexual harassment, racial discrimination, and retaliatory discharge, all in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, and 42 U.S.C. § 1981. The district court concluded that Lambert had not presented enough evidence to permit a jury to find that Peri fired him because of his race or his complaints. The court also held that the racial remarks Lambert described were "neither sufficiently severe nor pervasive to be actionable" as racial harassment. On the sexual harassment claim, the court found that there was no basis for holding Peri liable because Lambert failed to report the problem to someone with authority to address it.

**II**

Lambert emphasizes his claims of sexual and racial harassment, and so we begin there, using the familiar standard of review that applies to review of summary judgments. See *Harris N.A. v. Hershey,* 711 F.3d 794, 798 (7th Cir. 2013). To move forward on his sexual harassment claim, Lambert had to present evidence from which a trier of fact could reasonably conclude that because of his sex, he was subjected to unwelcome sexual conduct that was severe or pervasive enough to create a hostile work environment; in addition, he had to show that there is a valid basis for employer liability. *Vance v. Ball State Univ.,* 133 S. Ct. 2434 (2013) (employer liability); *Erickson v. Wis. Dep't of Corr.,* 469 F.3d 600, 604 (7th Cir. 2006) (substantive elements). An employer is strictly liable if a supervisor harasses the employee and the employer cannot establish the affirmative defense recognized in *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742 (1998); when a co-worker harasses an employee, the employer is liable only if the employer is negligent in discovering or remedying the harassment. *Vance,* 133 S. Ct. at 2439. Here, Robledo was a co-worker, and so Peri's liability turns on whether Lambert adequately alerted the company to the problem. Notice that is sufficient to trigger employer liability must be given to either someone with authority to take corrective action or, at a minimum, someone who could "reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it." *Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1037 (7th Cir. 1998).

If the employer has established a set of procedures for reporting complaints about harassment, the complainant ordinarily should follow that policy in order to provide notice sufficient for the employer to be held responsible, unless the policy itself is subject to attack as inadequate. *Id.*

Looking first to the sexual harassment claim, the district court found that the undisputed facts show that Peri could not be held responsible for Robledo's conduct, because Lambert made insufficient efforts to notify Peri of the sexual harassment. It noted that Lambert had complained only to Santiago and Avila, both yard leads with no authority to hire, fire, or discipline employees. Since yard leads could not discipline other employees, it thought, they could not reasonably be expected to receive or "process" complaints about harassment on Peri's behalf. Second, with regard to the harassment that occurred after Peri adopted its policy, the court stressed that Lambert had not followed the prescribed procedures, as he did not complain to either Osheroff or Peri's CEO.

Although after *Vance* we can assume that the yard leads were not supervisors whose conduct might directly be attributable to the company, that does not answer the question before us. Lambert was not complaining about harassment from either Santiago or Avila; he concedes that his case involves co-worker harassment from an entirely different person. Instead, he argues that complaints to people who stand higher in the chain of authority can be enough to begin the process of notify-

ing the employer about co-worker harassment, if the evidence shows that those limited supervisors can reasonably be expected to refer the complaint up to someone with authority to address it. *Parkins*, 163 F.3d at 1037. As we put it in *Young v. Bayer Corp.*, 123 F.3d 672 (7th Cir. 1997), a "[f]ocus on whether the information comes to the attention of someone who ought by specification of his duties or, failing that, general norms of management to do something about it, either directly or by referring the matter to some other corporate employee, is a better, . . . more practical, approach than asking at what level in a corporate hierarchy an employee is." *Id.* at 675. Santiago testified that as a yard lead, for "anything that was going wrong [it] was expected of me to report it to the yard manager." He also reported that a yard lead had a greater responsibility than a general laborer to report incidents of sexual harassment.

Santiago's testimony would permit a trier of fact to conclude that a complainant could reasonably expect that a yard lead had the responsibility to, and would, refer his complaints to someone who could address the problem—either the yard manager, the logistics manager, or the human resources manager. Santiago also testified that he heard Robledo say things like "suck my dick" to other employees in Spanish. He wrote this off as normal joking in which all yard workers participated, including Lambert. But if a trier of fact were to credit Santiago's own testimony as well as Lambert's version of events, it could find that Santiago knew that Lambert felt harassed by Robledo, that Lambert

did not see the comments as innocuous banter, and that Santiago realized that he was responsible for reporting problems like this to his superiors.

Because the sexual harassment policy was not in place at the time Lambert first complained to Santiago and Avila, Lambert's failure to follow the policy cannot absolve Peri of all liability. When Santiago and Avila ignored Lambert's early complaints (Avila purportedly laughed at Lambert), Lambert may have been discouraged from complaining about the problem again. The later adoption of a policy for reporting harassment does not negate the wrong in the company's failure to address complaints that were made before the policy existed. With respect to any harassment that continued after the policy was in place, we have a closer case. The record indicates that Lambert had contacted Osheroff on other matters, and so it is hard to say that the mechanism provided by the policy was unreasonable, or worse, so inaccessible that no one would use it. On the other hand, the fact that a company has designated one or two off-site corporate representatives to receive complaints of harassment does not license on-site managers to ignore complaints and evidence of co-worker harassment. That is particularly true if, as is the case here, there is evidence showing that the company expected its on-site managers to pass this type of complaint up the chain to the human resources manager even if the victimized employee has not (yet) used the policy. In effect, the victim is entitled to show that there is a company custom for reporting that is not memorialized in the written policy. We conclude that

a trier of fact could find that Lambert reasonably expected that his reports of the harassment to the two yard leads was enough to set in motion the process of bringing his complaints to the attention of someone with authority to remedy them.

We next turn to Lambert's racial harassment claim. The standards governing this claim parallel those for sexual harassment assertions: Lambert had to point to evidence indicating that because of his race, he was subjected to severe or pervasive conduct that created a "subjectively and objectively offensive" work environment, and, once again, that there is a basis for employer liability. *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 912 (7th Cir. 2010). In determining whether the conduct is sufficiently severe or pervasive to be actionable, we look at all of the circumstances, including the frequency of the discriminatory conduct, how offensive a reasonable person would deem it to be, whether it is physically threatening or humiliating conduct as opposed to verbal abuse, whether it unreasonably interferes with an employee's work performance, and whether it was directed at the victim. See *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002).

In *Peters* we concluded that an employee had not done enough to avoid summary judgment with the following evidence: a supervisor referred to "black music as 'wicka-wicka woo music'"; a co-worker used the word "nigger" in his presence; African-American guests were denied additional ice and cups at a party; a

supervisor asked a white co-worker to carry money when two African-American workers were present and available to do the job; the human resources director failed to say hello to two African-American employees; and "interracial strife" was revealed at a diversity training. *Id.* at 552. We pointed out that with the exception of the use of the word "nigger," not directed at the plaintiff, the other acts were "mildly offensive." *Id.*

Lambert's case is right on the line, but we think that the standard of review for summary judgments tips it slightly in his favor. The district court took the position that the most offensive statements—Wallace's reference to workers as "donkeys" and a "gorilla"; and Berger's statement directly to Lambert that he did not respect Lambert because he is a "nigger"—occurred over a period of several years, were not physically threatening, and did not affect Lambert's work performance. It also emphasized that Wallace's statements were not directed at Lambert.

But there was other evidence as well, and the district court's analysis gave too little weight to the degree of offense in Berger's direct racial insult to Lambert. According to Lambert, Wallace and Berger referred to workers on *multiple* occasions by names that a trier of fact could see as racial slurs. Wallace did not deny repeatedly calling workers "donkeys." He said only that he used that label to refer to all laborers, not only African-American ones. But a trier of fact would not be required to believe that explanation. Wallace also said that he used the term "gorilla" because the worker was

strong. Once again, the trier of fact might draw a different inference. The district court pointed out that nothing in the record indicates that Wallace applied the word "donkey" only to African-American workers, and that donkeys are commonly known as labor animals. But to survive summary judgment, Lambert was not required to present conclusive evidence that Wallace used the term "donkey" as a racial slur. If the jury were to credit Lambert's understanding of these words as racial slurs, this record contains substantial evidence of racial harassment. Here, crediting Lambert's evidence, supervisors repeatedly called employees racially offensive terms, as opposed to the single unfortunate occurrence in *Peters*. A trier of fact could conclude that the racial comments were severe or pervasive enough to create a hostile work environment.

## III

Our assessment of Lambert's retaliation and discrimination claims is the same as the district court's: Lambert has no evidence indicating that Peri tested him or let him go because of his race or his complaints about harassment. Without evidence showing that a rational jury could conclude that Peri terminated him because of his race or his complaints, he cannot succeed. *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring). (It is undisputed that he is a member of a protected class and that he suffered an adverse action.) Where, as here, there is no direct evidence of retaliation or discrimination, we have identified several types of circum-

stantial evidence that may establish retaliatory or discriminatory motive: "suspicious timing, ambiguous statements oral or written, . . . and other bits and pieces from which an inference of [retaliatory] intent might be drawn"; "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently"; and "evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* at 860 (internal quotation marks and citations omitted).

Lambert did not submit any circumstantial evidence of the kind described above. There was nothing suspicious about the timing of any statements Peri representatives made, and he did not offer evidence of disparate treatment. Finally, because the results of his alcohol test and the existence of Peri's "no tolerance" policy are clear, there is no evidence that Peri's stated reason for its action was pretextual. Because Lambert actually turned out to be intoxicated, it is unlikely that Santiago and Wallace fabricated their suspicion or lied about Lambert's behaving strangely that morning. Their call to Osheroff in order to confirm that they had cause for testing corroborates their testimony that they were genuinely concerned about the proper way to proceed in light of their observations of Lambert. Moreover, it appears that this was the only occasion on which Peri tested Lambert. Had Peri begun to test Lambert frequently after he complained about racial and sexual harassment, matters might be different. But it did not.

It is also telling that Lambert has not introduced any evidence suggesting that Peri disproportionately

required drug tests from African-American employees. Lambert makes much of the fact that all five employees discharged from his facility for intoxication between 2006 and 2008 were African-American. But this figure does not support the inference that Peri was testing employees in a discriminatory manner. In order to suggest that Peri was testing African-American employees because of their race, Lambert would need evidence indicating that Peri administers drug tests to African-American employees *without reasonable suspicion* more often than other employees. If, for example, he could have shown that 90% of the drug tests Peri administered to African-American employees were negative, while only 20% of tests administered to white employees were negative, further inquiry would be needed. But once again, there is no such evidence in this record.

Lambert has not identified one similarly situated employee who also failed a drug or alcohol test but was not fired. In other words, he has no evidence that the no-tolerance policy is disparately enforced against African-American employees. He admits that every Peri employee that has failed a drug test has lost his job. And he admits that Peri fired at least eight white employees for failing drug tests at its U.S. facilities between 2006 and 2008. With nothing warranting a trial on these claims, the district court correctly granted summary judgment for Peri.

* * *

We REVERSE the district court's judgment on Lambert's claims of racial and sexual harassment, and we AFFIRM

its judgment on his discrimination and retaliation claims. Each party is to bear its own costs.