**Karen STECK, Plaintiff,**

v.

**Thomas FRANCIS, Individually and in his official capacity with the City of Fort Dodge Police Department, and the City of Fort Dodge, Defendants.**

No. 04–3026–MWB.

United States District Court,
N.D. Iowa,
Central Division.

April 21, 2005.

Blake Parker, Fort Dodge, IA, for Plaintiff.

Scott J. Beattie, Des Moines, IA, for Defendants.

## MEMORANDUM OPINION AND ORDER REGARDING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .956
 A. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .956
 1. The parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .957
 2. Allegations of harassment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .957

 3. *Allegations of retaliation* ........................................958
 B. *Procedural Background*..........................................959
 1. *The Complaint* ...............................................959
 2. *The motion for summary judgment* ...........................959

II. *LEGAL ANALYSIS* .................................................959
 A. *Standards For Summary Judgment* ...............................959
 B. *Steck's Hostile Environment Claim* .............................960
 1. *Arguments of the parties* .....................................960
 2. *Analysis* .....................................................962
 a. *The required showings* ....................................962
 i. *Federal and Iowa claims* .............................962
 ii. *The prima facie case* .................................962
 iii. *Actionable harassment* ...............................963
 b. *Determination without regard to the harasser's status* ...........964
 c. *Relevance of the harasser's status*............................966
 i. *Eighth Circuit precedent* .............................966
 ii. *Other courts* .........................................967
 iii. *Additional considerations* ..........................971
 iv. *The proper calculus* ..................................973
 d. *Determination in light of the harasser's status* ..................974
 C. *Steck's Retaliation Claim* .....................................975
 1. *Arguments of the parties* .....................................975
 2. *Analysis* .....................................................976
 a. *Continued viability of the burden-shifting analysis* ..............976
 b. *First-stage challenges*.....................................977
 c. *Third-stage challenges* ...................................978
 d. *Summary* ...............................................978

III. *CONCLUSION* ...................................................978

Even apparently immutable legal principles, such as the stone tablet edict of Title VII that "thou shalt not discriminate because of sex,"[1] must be applied through an active analytical process involving such tools as "sliding scales," "burden-shifting analyses," and "balancing tests," rather than a static yardstick, if courts are to evaluate properly the circumstances of each case. After all, the situations to which legal principles must be applied are not lithographs, but motion pictures, involving interactions, not just juxtapositions, of circumstances, persons, and personalities. This case, which involves a female police officer's claims of a sexually hostile work environment created by relatively few sexually-charged comments by a male chief of police and retaliation for complaining about such harassment, demonstrates why such an active analytical process is required.

## I. INTRODUCTION

### A. *Factual Background*

The court will not attempt here an exhaustive dissertation of the undisputed and disputed facts in this case. Rather, the court will identify the core of undisputed facts and sufficient of the disputed facts to put in context the parties' arguments for and against summary judgment.

1. Title VII provides, in pertinent part, as follows: "It shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a).

### 1. The parties

Plaintiff Karen Steck has been employed as a police officer with the Fort Dodge Police Department (the Department) since 1999. Defendant Thomas Francis has been a police officer with the Department since 1977. Francis became the Department's "Acting Chief" in August of 2002, replacing Chief Ivan Metzger, and was appointed as the permanent Chief in September of 2003. The parties agree that Steck and Francis had known each other since Steck was a child, because Steck was a friend of Francis's daughter, she lived in the house next door to the Francises, and at one time, played on a basketball team coached by Francis.

### 2. Allegations of harassment

Steck contends that she has had two major disputes with the Department during her tenure. Steck's first dispute with the Department, which arose in 1999 after she became pregnant, concerned light duty assignment. However, that dispute was resolved to Steck's satisfaction, after her attorney became involved, when she was transferred to the detective unit. The parties agree that Francis had no involvement in that dispute. The court also does not read Steck's Complaint in this action to assert any claim based on the dispute in 1999, although Steck apparently contends that this first dispute is relevant to the present dispute.

The second dispute, which is the subject of Steck's present lawsuit, arises from four comments by Francis in 2001 and 2003 that Steck contends created a sexually hostile work environment. Francis does not deny making the comments. Rather, Francis and the City contend that the comments are insufficient to create a hos-

tile environment that is actionable pursuant to either Title VII or the Iowa Civil Rights Act. Consequently, the court will describe in turn the four comments upon which Steck's hostile environment claim relies.

Francis made the first comment on which Steck's hostile environment claim is based in the summer of 2001, while Steck and Francis were working with the Storm Lake Police Department during RAGBRAI festivities.[2] During the course of a meeting with several officers on the street, Francis purportedly noticed Steck eating a large amount of food and commented, "You aren't pregnant again, are you?" Although Steck was apparently offended by the question, she did not complain about this comment to any of her supervisors at the time.

Francis also made the second comment at issue here at some point during calendar year 2001, when Steck and other officers were watching a video on newly-purchased Department equipment. Francis walked by and commented to Steck, "Don't be bringing any videos of you naked in the shower." Steck asserts that this comment, which was directed solely at her in the presence of other male officers, made her feel uncomfortable. Therefore, she told then-Chief Ivan Metzger about the comment. The parties dispute whether Steck asked Chief Metzger not to do anything about the comment, but they agree that Chief Metzger spoke to Francis about the comment, and that Steck felt Chief Metzger's handling of the incident was adequate at the time.

Francis allegedly made the third comment at issue here in March 2003, when he approached Steck to ask her whether or

---

2. RAGBRAI, the Register's Annual Great Bicycle Ride Across Iowa, is an annual event during which hundreds of bicyclists ride across Iowa in stages over a period of several days. The route varies each year, so that different communities are stopping points from year to year. Various festivities occur in host communities. *See* www.ragbrai.org.

not she had read the local newspaper that morning. When Steck said that she had not, Francis said that there was a letter to Ann Landers that Steck "needed to read because it reminded [him] of [her] when [she] was growing up." Francis said Steck should tell him about it later. Steck alleges that Francis asked her more than once during the day whether she had read the Ann Landers article. Steck eventually read the article in the presence of another detective while en route to interview a subject. The article was about a letter from a twelve-year-old female who was upset about having large breasts. Upon reading the article, Steck became very upset. She complained about Francis's comments to her supervisor, Captain Utley. Captain Utley directed Steck to the Mayor's Office. However, Steck asserts that she reported the incident to her union representatives, Officers Guthrie and Beshey, before she brought her complaint to the Mayor's Office. The union representatives purportedly told Steck that the incident was not a union matter, so that she should get an attorney. Steck then met with the Mayor and the Mayor's assistant to tell them about Francis's comment. The Mayor instituted an investigation as the result of which Chief Francis made a formal apology to Steck for the comment.

Francis made the fourth comment at issue here just a few days after Steck had complained to the Mayor's Office about the third comment. At the time of the fourth comment, Steck and Francis were in the detectives' office. Francis picked up a protective vest from another officer's desk. The vest had no breast cups in it, as it would if it were issued to a female officer, so Francis commented, "I know this is not yours." Steck does not assert that Francis made any express or implicit reference to the lack of breast cups, but nevertheless now argues that Francis used the vest with no breast cups simply as another excuse to comment on Steck's breasts. Al-

though Francis contends that he was only trying to determine the person responsible for police equipment left lying around the office, Steck contends, without dispute from the defendants, that Francis made no other attempt to determine to whom the vest belonged. The record does not indicate that Steck complained about this incident to Francis or anyone else in the Department before filing a civil rights complaint.

### 3. Allegations of retaliation

Steck contends that, as a result of her complaint of sexual harassment, she suffered the following kinds of retaliation: (1) she was denied a promotion to sergeant in the Department; (2) she was moved from the detective unit to patrol duty; (3) she was assigned twelve-hour shifts instead of eight-hour shifts; (4) she was put on standby for Thanksgiving Day after asking for that day off, when officers who requested the day off later were given the day off, and she was only given the day off when she complained; (5) she was the only officer not permanently assigned a vehicle, the vehicles made available to her did not always have an attached radio, and handheld radios were not always available for her use; (6) various investigations were initiated involving her or officers who had contact with her; (7) the Mayor asked her if she had done anything to bring upon herself the comments made by Francis; and (8) after she complained to the Mayor about Francis's comment concerning the Ann Landers article, a memo was posted detailing procedures for being allowed to talk to the Mayor and using the chain of command for complaints. These incidents will be discussed in more detail, if warranted, in the legal analysis of Steck's retaliation claim below. Suffice it to say that the defendants either dispute that such incidents occurred or assert that there are legitimate, non-retaliatory reasons for the incidents that Steck contends are retaliato-

ry. The defendants contend, further, that Steck has not shown that the proffered legitimate reasons for supposedly retaliatory incidents are pretextual.

## B. Procedural Background

### 1. The Complaint

Steck filed her Complaint in this matter on March 18, 2004, naming as defendants Chief Francis, in both his individual and official capacities, and the City of Fort Dodge (the City). As her "First Cause Of Action," Steck alleges "discriminatory actions" of the defendants in violation of Title VII of the Civil Rights Act of 1964. As her "Second Cause Of Action," Steck alleges "discriminatory actions" of the defendants in violation of the Iowa Civil Rights Act (ICRA). The parties have clarified in their briefs that the first and second causes of action are claims of sexual harassment in the form of creation of a sexually hostile work environment. As her "Third Cause Of Action," Steck alleges "retaliatory actions" of the defendants in violation of both Title VII and the ICRA. Steck seeks declarations that the defendants' conduct violated Title VII and the ICRA, an award of back wages and actual compensatory damages, future wages and future compensatory damages, punitive damages, costs, interest, attorney fees, and such other relief as is appropriate. Trial in this matter is set to begin on June 20, 2005.

### 2. The motion for summary judgment

On January 26, 2005, Francis and the City filed a motion for summary judgment on all of Steck's claims. Steck resisted that motion on February 22, 2005, and the defendants filed a reply in further support of their motion on March 4, 2005. The defendants did not initially request oral arguments on their motion. Although Steck requested oral arguments in her resistance, the court has not found oral arguments necessary to the resolution of the defendants' motion for summary judgment. Moreover, the court's busy schedule, including post-trial motions in one federal death-penalty case and pre-trial motions and jury selection in another, as well as resolution of an application for an emergency temporary restraining order in a complicated civil case involving telecommunications companies, has not permitted the timely scheduling of oral arguments sufficiently in advance of trial in this matter to permit timely resolution of the motion for summary judgment. Therefore, the court will resolve the defendants' motion for summary judgment on the parties' written submissions.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

The parties here agree generally on the standards applicable to a motion for summary judgment. Rule 56 of the Federal Rules of Civil Procedure provides that a defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims against that party. FED. R. CIV. P. 56(b). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). As this court has explained on a number of occasions, applying the standards of Rule 56, the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). In reviewing the record, the court must view all the facts in the light most favorable to

the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Quick*, 90 F.3d at 1377 (same).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir.1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir.1997), *cert. denied*, 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir.1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87, 106 S.Ct. 1348). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *i.e.*, are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394.

█ If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir.1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir.1994). Finally, this court has repeatedly taken note of the rule in this circuit that, because summary judgment often turns on inferences from the record, summary judgment should seldom or rarely be granted in employment discrimination cases. *See, e.g., Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir.1991)).

The court will apply these standards to the motion for summary judgment by Francis and the City on Steck's sexually hostile environment and retaliation claims.

### B. Steck's Hostile Environment Claim

#### 1. Arguments of the parties

In support of their motion for summary judgment, the defendants contend that Steck's claim for hostile environment harassment fails as a matter of law, because the actions upon which the claim relies were neither severe nor pervasive. They argue that the four comments at issue are too infrequent and not nearly severe enough to create an objectively hostile environment, because the comments involved no physical threat or humiliation, the comments were not accompanied by any physical contact, some of the com-

ments were not even overtly sexual in nature, and at most, the comments constituted sporadic gender-related jokes or teasing. They also contend that the comments did not create a subjectively hostile environment, because Steck herself stated in her deposition that she did not believe that her work environment was *sexually* hostile, even if there was now "tension" between her and Francis over her complaints and ongoing litigation.

In resistance to summary judgment on her hostile environment claim, Steck contends that, viewing the evidence in the light most favorable to her, the environment to which Francis subjected her was sufficiently sexually hostile to be actionable. She contends that each of the comments in question was either overtly or implicitly sexual and that all detracted from her conditions of employment and ability to concentrate on her job. She contends that Francis improperly exercised his perceived "power," based on his past personal relationship with Steck and his position as Acting Chief then Chief, to make sexually harassing comments to Steck. Steck contends that the four comments that she has identified as sexually harassing were the only four direct communications between her and Francis between 2001 and 2003, although she and Francis came face-to-face on numerous other occasions. Thus, according to Steck, every time that Francis chose to speak to Steck directly, he made a sexually harassing comment. Consequently, Steck contends that, when these comments are considered in the totality of her working relationship with Francis, they were sufficiently severe and pervasive to create a sexually hostile environment. She contends that the resulting tension

prevented her from communicating with her ultimate superior, the Chief of Police, and otherwise permeated her work environment. For example, she contends that Francis avoided her by changing direction or dodging into the bathroom when he saw her. She also contends that the failure to assign her a regular police vehicle on a permanent basis was not only retaliatory, but another incident of sexual harassment. In short, she contends that the defendants' arguments are really about the inferences to be drawn from contested facts, not arguments that justify judgment as a matter of law on an undisputed record.

■ In reply, the defendants reiterate their contention that the incidents upon which Steck's hostile environment claim is based are simply insufficient. They contend, first and foremost, that the incidents are infrequent, minor jokes that do not meet an objective standard for a hostile environment. They contend, further, that Steck has misrepresented the record concerning whether she spoke to or had contact with Francis other than the allegedly harassing incidents, when the record actually shows that there were really only brief time periods—after her complaint in 2001 and after her formal complaint in 2003—during which Francis and Steck did not talk. Moreover, the defendants contend that Steck has admitted that the tension in the workplace and the tension between her and Francis is not sexual in nature, but arises from ongoing proceedings. They also contend that Steck's lack of contemporaneous complaints about some of the incidents demonstrates that Steck did not find them subjectively hostile. Finally, they contend, for the first time,[3] that they took corrective action relieving them of liability.

---

**3.** The court will not consider an argument raised for the first time in a reply brief. *See* N.D. IA. L.R. 7.1(g); *Lorenzen v. GKN Armstrong Wheels, Inc.*, 345 F.Supp.2d 977, 992 n.

4 (N.D.Iowa 2004); *Baker v. John Morrell & Co.*, 263 F.Supp.2d 1161, 1169 n. 1 (N.D.Iowa 2003); *see also Republican Party of Minn. v.*

Thus, the defendants contend that no reasonable jury could find in favor of Steck on her hostile environment claim.

### 2. Analysis

#### a. The required showings

**i. Federal and Iowa claims.** This court has previously noted that "[i]t is widely accepted in the Eighth Circuit that generally no distinction is made between claims based on federal law and comparable state law claims under the ICRA." *Soto v. John Morrell & Co.*, 285 F.Supp.2d 1146, 1177–78 (N.D.Iowa 2003) (citing *Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1046 (8th Cir.2003); *Beard v. Flying J, Inc.*, 266 F.3d 792, 798 (8th Cir.2001)). This is so, because the Iowa Supreme Court has recognized that federal precedent is applicable to discrimination claims under the ICRA. *See id.* at 1178 (citing *Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999), which states, "The ICRA was modeled after Title VII of the United State Civil Rights Act. Iowa courts therefore turn to federal law for guidance in evaluating the ICRA."). However, federal law is not controlling, but merely provides

an analytical framework for analyzing ICRA claims. *Id.* (citing *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989)). With these principles in mind, unless a distinction between Title VII and the ICRA becomes critical, the court will analyze Steck's state and federal hostile environment claims together using federal precedent.

**ii. The prima facie case.** As the Eighth Circuit Court of Appeals has repeatedly explained, to establish a *prima facie* case of sexual harassment, in order to defeat a motion for summary judgment, the plaintiff must show the following: (1) he or she was a member of a protected group, that is, male or female; (2) he or she was subjected to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) there is a basis for imposing liability on the employer for harassment. *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1047 (8th Cir.2005); *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1068 (8th Cir.2005); *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792 (8th Cir.2004).[4]

*Kelly*, 247 F.3d 854, 881 (8th Cir.2001) ("It is well established that issues not argued in an opening brief cannot be raised for the first time in a reply brief," citing *United States v. Vincent*, 167 F.3d 428, 432 (8th Cir.), *cert. denied*, 528 U.S. 848, 120 S.Ct. 124, 145 L.Ed.2d 105 (1999); *South Dakota Mining Ass'n v. Lawrence County*, 155 F.3d 1005, 1011 (8th Cir.1998); *United States v. Davis*, 52 F.3d 781, 783 (8th Cir.1995); *French v. Beard*, 993 F.2d 160, 161 (8th Cir.1993), *cert. denied*, 510 U.S. 1051, 114 S.Ct. 706, 126 L.Ed.2d 672 (1994)).

**4.** In the case of co-worker harassment, the fifth element requires a showing that the employer "knew or should have known of the harassment and failed to take proper remedial action." *Kratzer*, 398 F.3d at 1047; *Pedroza*, 397 F.3d at 1068; *Erenberg*, 357 F.3d at 792. However, where, as here, the alleged harassment was by a supervisor, employer liability is analyzed under the standards set

forth by the Supreme Court in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). *McCurdy v. Arkansas State Police*, 375 F.3d 762, 770 (8th Cir.2004). The Eighth Circuit Court of Appeals recently explained the *Ellerth/Faragher* standards for employer liability for harassment by a supervisor as follows:

> [T]he Court announced its holding [in *Ellerth* and *Faragher*]:
> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, which comprises two necessary elements: (a) that the employer exercised

■ ***iii. Actionable harassment.*** The element of the *prima facie* case that is principally in dispute here is the fourth one, whether or not the harassment affected a term, condition, or privilege of employment, *i.e.*, whether the harassment is "actionable." The Eighth Circuit Court of Appeals has explained that this element requires "a twofold inquiry":

> First, the harassment must be sufficiently severe or pervasive to create an "objectively hostile" work environment. *Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021, 1026 (8th Cir. 2004).... Second, if the victim does not subjectively perceive the environment as abusive, then the conduct has not altered the conditions of employment. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

*Kratzer*, 398 F.3d at 1047. The prongs of this inquiry require some deeper consideration in this case.

■ As to the first prong of the inquiry, whether or not the environment was "objectively hostile,"

> reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.
> [*Ellerth* ], [524 U.S.] at 764–65, 118 S.Ct. 2257, 141 L.Ed.2d 633; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275, 141 L.Ed.2d 662. The Court accentuated that "[n]o affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257, 141 L.Ed.2d 633; *Faragher*, 524 U.S. at 808, 118 S.Ct. 2275, 141 L.Ed.2d 662; *see also Pa. State Police v. Suders*, 542 U.S. 129, 124 S.Ct. 2342, 2352, 159 L.Ed.2d 204 (2004) (recognizing *Ellerth* and *Faragher*, which govern employer liability for supervisor sexual harassment, "delineate[d] two categories of hostile work environment

[the environment] must be more than merely offensive, immature or unprofessional; it must be extreme. *Id.* at 1027, citing *Alagna v. Smithville R–II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir.2003). Conduct that does not exceed the threshold of severity is insufficient to create a prima facie case of sexual harassment. "Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace." *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 967 (8th Cir.1999).

*Kratzer*, 398 F.3d at 1047. To put it another way,

> "Sexual harassment 'standards are demanding—to be actionable, conduct must be extreme and not merely rude or unpleasant.'" *Tuggle [v. Mangan]*, 348 F.3d [714,] 720 [ (8th Cir.2003) ] (quoting *Alagna v. Smithville R–II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir.2003)). " 'More than a few isolated incidents are required,' and the alleged harassment must be 'so intimidating, offensive, or hostile that it poisoned the work envi-

> claims: (1) harassment that 'culminates in a tangible employment action,' for which employers are strictly liable, and (2) harassment that takes place in the absence of a tangible employment action, to which employers may assert an affirmative defense") (citation omitted).
> *McCurdy*, 375 F.3d at 770. One major exception to the use of federal precedent to analyze discrimination claims under the ICRA is that " 'the Iowa Supreme Court has never adopted the *Ellerth/Faragher* model for vicarious liability of an employer for [ ] harassment by a supervisor,' instead relying on the 'knew or should have known' standard for assessing liability" for supervisor harassment. *Soto*, 285 F.Supp.2d at 1178 (quoting *Stricker v. Cessford Constr. Co.*, 179 F.Supp.2d 987, 1014 (N.D.Iowa 2001)). However, the "employer liability" element is not at issue in the defendants' motion for summary judgment in this case; therefore, this distinction between Iowa and Federal law is not implicated at this point in this case.

ronment.'" *Id.* (quoting *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir. 1999)). [The plaintiff] must prove [her] workplace was "permeated with discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

*LeGrand v. Area Resources for Community and Human Servs.*, 394 F.3d 1098, 1101–02 (8th Cir.2005).

▪ Determination of whether or not an environment was "objectively hostile" is "a fact-intensive inquiry." *See Moring v. Arkansas Dep't of Correction*, 243 F.3d at 452, 456 (8th Cir.2001) (citing *Bales v. Wal–Mart Stores, Inc.*, 143 F.3d 1103, 1109 (8th Cir.1998)). Although a single offensive utterance or exposure to distasteful conduct ordinarily does not rise to the level of a Title VII violation, *see Hathaway v. Runyon*, 132 F.3d 1214, 1221 (8th Cir. 1997), there is no "rule of law holding that a single incident can never be sufficiently severe to be hostile-work-environment sexual harassment." *Moring*, 243 F.3d at 456. Thus, "[w]hether an environment was objectively hostile or abusive must be judged by looking at the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Eliserio v. United Steelworkers of Am. Local 310*, 398 F.3d 1071, 1076 (8th Cir.2005); *LeGrand*, 394 F.3d at 1102 (same factors).

▪ As to the second prong of the inquiry, whether or not the environment was "subjectively hostile," "'if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.'" *Woodland v. Joseph T.*

*Ryerson & Son, Inc.*, 302 F.3d 839, 843 (8th Cir.2002) (quoting *Harris*, 510 U.S. at 21, 114 S.Ct. 367); *accord Kratzer*, 398 F.3d at 1047 (also citing *Harris*). "[A]n employee's admission that [the environment] was not abusive is fatal to the employee's Title VII sexual harassment claim." *Kratzer*, 398 F.3d at 1047 (citing *Montandon v. Farmland Ind., Inc.*, 116 F.3d 355 (8th Cir.1997), and *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)).

The court must determine whether Steck has generated genuine issues of material fact on both of these prongs of the "actionable harassment" element to defeat the defendants' motion for summary judgment on her hostile environment claim. Steck contends that the impact of Francis's comments was particularly devastating, where he was the Chief of Police, her highest superior in the Department. Under such circumstances, she contends that she has generated a genuine issue of material fact as to whether or not the environment created by Francis's comments was sufficiently hostile to be actionable, notwithstanding the relative infrequency of the incidents upon which her hostile environment claim relies. The defendants, on the other hand, assert that the incidents upon which Steck's hostile environment claim rely are too minor to constitute actionable harassment, regardless of Francis's status. The court will consider, first, whether Steck's hostile environment claim is actionable without regard to the harasser's status, then consider whether Steck is correct that the harasser's status is not only relevant, but determinative in this case.

### b. Determination without regard to the harasser's status

▪ This court recognizes that, if the harasser's status as either a co-worker or

supervisor is irrelevant to the determination of whether the environment was objectively hostile, then a reasonable jury probably could not find that Steck's claim involved an "objectively hostile" environment. While Francis's comments to Steck were undoubtedly offensive, immature, unprofessional, rude, and unpleasant, comments of such character are not enough to create an objectively hostile work environment. *Kratzer*, 398 F.3d at 1047; *LeGrand*, 394 F.3d at 1101–02. Indeed, considering the totality of the circumstances, four incidents over approximately two years are only infrequent and isolated; a reasonable jury could find that at least two of the incidents were essentially innocuous (the comment on pregnancy and the comment on ownership of the protective vest, which involved no explicit reference to breast cups) and, thus, were not sufficiently severe; none of the conduct was physically threatening, although the "nude shower videos" and "Ann Landers letter" comments may have been humiliating, so that all involved "merely" offensive utterances; and, even reviewing the record in the light most favorable to Steck, it is doubtful that a reasonable jury could find that the comments interfered with Steck's work performance, rather than merely "upsetting" her. *See Eliserio*, 398 F.3d at 1076 (identifying such factors); *LeGrand*, 394 F.3d at 1102 (same factors).

Moreover, the Eighth Circuit Court of Appeals has "found summary judgment proper in several cases, due to the plaintiff's failure to meet the fourth element of a hostile environment sexual harassment claim" in cases involving incidents at least as frequent and at least as severe as those on which Steck's hostile environment claim is based. *LeGrand*, 394 F.3d at 1102 (citing *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 935 (8th Cir.2002), as holding that the trial court improperly denied an employer's summary judgment motion, where the hostile environment claim was premised on five incidents: a proposition for a relationship; improper touching of the plaintiff's hand on multiple occasions; a request the plaintiff sketch a sexually objectionable planter; the posting of a "Man Hater's Club" poster; and a request the plaintiff "type the He–Men Women Haters beliefs," and the harasser also had in his office a child's pacifier in the shape of a penis and a computer screen saver with a picture of a naked woman, because "[w]hile the harassment made the plaintiff uncomfortable and was 'boorish, chauvinistic, and decidedly immature,'" it was not sufficiently hostile; *Tuggle*, 348 F.3d at 714, 722, as holding that, while the plaintiff "'was clearly subjected to harassing conduct,' it was not 'actionable conduct' where a co-worker made a number of comments based on the plaintiff's sex and posted a photograph showing the plaintiff's 'clothed rear end'"; *Ottman v. City of Independence*, 341 F.3d 751, 760 (8th Cir.2003), as concluding that the district court erred in finding a triable issue for the jury where the conduct consisted of belittling and sexist remarks on almost a daily basis; *Meriwether v. Caraustar Packaging Co.*, 326 F.3d 990, 993 (8th Cir.2003), as holding that a sexual harassment claim failed where a co-worker grabbed the plaintiff's buttock and then confronted her about it the next day; and *Alagna*, 324 F.3d at 977–78, 980, as concluding that the co-worker's conduct was inappropriate, but not sufficiently severe or pervasive where it included calls to the plaintiff's home, frequent visits to her office, discussions about relationships (not including sexual details) with his wife and other women, touching the plaintiff's arm, saying he "loved" her and she was "very special," placing romance novels in her faculty mailbox, and invading her personal space). In light of these cases, if the harasser's status is irrelevant, the incidents upon which Steck relies appear to be too mild and too

infrequent, as a matter of law, to constitute a hostile environment.

### c. *Relevance of the harasser's status*

Steck contends that the harasser's status is not only relevant to the determination of whether a harassment claim is actionable, but that, in this case, the incidents at issue were sufficiently severe to be actionable precisely because they were perpetrated by her highest supervisor in the Department, then Acting Chief Francis. The court, therefore, turns to the question of whether the harasser's status matters to the "actionable harassment" inquiries.

### i. *Eighth Circuit precedent.*

If Steck is correct that the harasser's status matters to the determination of whether or not harassment is actionable, then most of the cases cited in *LeGrand* could be distinguished on the ground that they involved co-worker harassment. *See Ottman*, 341 F.3d at 755 (the harasser who made sexist remarks almost daily did not have supervisory authority over the plaintiff or authority to recommend disciplinary action against her); *Meriwether*, 326 F.3d at 993 (a co-worker grabbed the plaintiff's buttocks and subsequently confronted the plaintiff); *Alagna*, 324 F.3d at 977–78 (non-supervisory co-worker harassment); *but see Tuggle*, 348 F.3d at 714 (described in *LeGrand* as co-worker harassment, but actually involving harassment by a supervisor).

However, the *Duncan* decision involved alleged harassment by the plaintiff's immediate supervisor. *See Duncan*, 300 F.3d at 931 (the alleged harasser was the plaintiff's training coordinator), *see id.* at 937 (Arnold, C.J., dissenting) (describing the harasser as the plaintiff's "supervisor"). The court in *Duncan* concluded that five incidents of harassment by the plaintiff's supervisor, which were at least as severe as the four incidents to which Steck was subjected, did not constitute actionable harassment. *Id.* at 935 (finding insufficient a hostile environment claim premised on five incidents: a proposition for a relationship; improper touching of the plaintiff's hand on multiple occasions; a request the plaintiff sketch a sexually objectionable planter; the posting of a "Man Hater's Club" poster; and a request that the plaintiff "type the He–Men Women Haters beliefs," where the harasser also had in his office a child's pacifier in the shape of a penis and a computer screen saver with a picture of a naked woman). Thus, *Duncan* suggests that even harassment by a supervisor of the type and relative infrequency alleged here would not be actionable.

The decision in *LeGrand* likewise cannot be distinguished on the basis that it did not involve harassment by a supervisor. In *LeGrand*, the trial court had determined that the alleged harasser was neither the plaintiff's supervisor nor the plaintiff's co-worker. *LeGrand*, 394 F.3d at 1101. The appellate court did not address the alleged harasser's status, because the appellate court found that the plaintiff had failed to establish a *prima facie* case of hostile work environment sexual harassment on the "objectively hostile" element. *Id.* Specifically, the court held that "three isolated incidents, which occurred over a nine-month period, were not so severe or pervasive as to poison [the plaintiff's] work environment," even where the incidents "ranged from crass to churlish and were manifestly inappropriate." *Id.* at 1103–04. Thus, because the court did not consider the harasser's status in determining that the environment alleged was not "objectively hostile," the *LeGrand* decision could be read to stand for the proposition that the status of the harasser is irrelevant to the determination of whether the environment is "actionable." The *LeGrand* decision would then also strongly suggest that the four incidents over a two-

year period at issue in Steck's case, which were also "crass" and "manifestly inappropriate," but perhaps little more, probably are not sufficiently "objectively hostile" to be actionable.

Finally, the Eighth Circuit Court of Appeals has, at least tacitly, applied the same factors to analysis of the objective hostility of supervisor harassment as it applies to co-worker harassment. *Compare Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021, 1026 (8th Cir.2004) (same factors for supervisor harassment); *with Baker v. John Morrell & Co.*, 382 F.3d 816, 828 (8th Cir.2004) (same factors for co-worker harassment); *see also Eliserio*, 398 F.3d at 1076 (same factors were pertinent to analysis of the hostility of the environment created by a labor union); *LeGrand*, 394 F.3d at 1102 (considering the same factors where the court declined to determine whether the harasser was a co-worker or supervisor). Nor, so far as this court can find, has the Eighth Circuit Court of Appeals ever suggested that the factors bear any different weight depending on the status of the harasser as either a co-worker or supervisor.

On the other hand, this court has found no decision of the Eighth Circuit Court of Appeals expressly holding that the status of the alleged harasser is irrelevant to the question of whether the environment was "objectively hostile." Therefore, the court will look to decisions of other courts for further guidance.

*ii. Other courts.* Like the Eighth Circuit Court of Appeals, other courts, such as the neighboring Fifth, Seventh, and Tenth Circuit Courts of Appeals, apply the same "totality of the circumstances" analysis to determine whether harassment is actionable, whether the alleged harasser is a co-worker or a supervisor. *Compare, e.g., Septimus v. University of Houston*, 399 F.3d 601, 611 (5th Cir.2005) (supervisor harassment), *with Hockman v. West-*

*ward Communications, L.L.C.*, 122 Fed. Appx. 734, 741 (5th Cir.2004) (co-worker harassment); *compare, e.g., Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir.2005) (supervisor harassment), *with Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975–76 (7th Cir.2004) (supervisor or co-worker harassment); *compare, e.g., Chavez v. New Mexico*, 397 F.3d 826, 832–33 (10th Cir.2005) (supervisor harassment), *with O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097–98 (10th Cir.1999) (supervisor and co-worker harassment); *see also Lagunovich v. Findlay City Sch. Sys.*, 181 F.Supp.2d 753, 768 (N.D.Ohio 2001) ("I must consider the same factors used in analysis of co-worker harassment to determine the severity or pervasiveness of supervisor harassment."). The Sixth and Tenth Circuit Courts of Appeals apply the same "totality of the circumstances" analysis to *combined* harassment by *both* co-workers and supervisors. *See, e.g., EEOC v. Harbert–Yeargin, Inc.*, 266 F.3d 498, 509 (6th Cir.2001) (" '[T]he totality-of-the-circumstances test mandates that district courts consider harassment by all perpetrators combined when analyzing whether a plaintiff has alleged the existence of a hostile work environment.' ") (quoting *Williams v. General Motors Corp.*, 187 F.3d 553, 562 (6th Cir.1999)); *O'Shea*, 185 F.3d at 1097–98. Indeed, a more complete discussion by the Sixth Circuit Court of Appeals of the mandate to combine harassment by co-workers and supervisors could be read as a rejection of different analyses of co-worker and supervisor harassment for any purpose other than determination of employer liability:

> We recognize that district courts are required to separate conduct by a supervisor from conduct by co-workers in order to apply the appropriate standards for employer liability, the fifth element in a hostile-work-environment-claim. However, the totality-of-the-circum-

stances test mandates that district courts consider harassment by all perpetrators combined when analyzing whether a plaintiff has alleged the existence of a hostile work environment, the fourth element of a hostile-work-environment claim. The totality of the circumstances, of necessity, includes all incidents of alleged harassment; as such, *district courts must not conduct separate analyses based on the identity of the harasser unless and until considering employer liability.*

*Williams,* 187 F.3d at 562–63 (emphasis added); *see also id.* at 563 n. 4 (stating that "the first four elements of [a] hostile-work-environment claim are identical regardless of the harasser"). However, another fair reading of this decision-and in this court's view, the more reasonable one—is that the decision only prohibits parsing a hostile environment into harassment by supervisors and harassment by co-workers, because courts must instead consider the "totality" of the harassment by all harassers to determine whether the harassment is sufficiently severe or pervasive to be actionable, even though the ultimate determination of employer liability depends, in part, upon the status of the harassers. Thus, this court has not found any decision that expressly bars consideration of the status of the harasser in the determination of whether or not the harassment is actionable.

The Supreme Court's decision in *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), is the source of the typical recitation of pertinent factors for determining whether, in "all the circumstances," the harassment is actionable, *Harris,* 510 U.S. at 23, 114 S.Ct. 367, but that decision cannot be read as an implicit prohibition on consideration of the status of the harasser. After establishing that the test for a hostile environment is whether "the environment would reasonably be perceived, and is perceived, as hostile or abusive," the Court observed, "This is not, and by its nature cannot be, a mathematically precise test." *Harris,* 510 U.S. at 22, 114 S.Ct. 367. The Court continued,

> We need not answer today all the potential questions [this test] raises, nor specifically address the Equal Employment Opportunity Commission's new regulations on this subject, see 58 Fed.Reg. 51266 (1993) (proposed 29 CFR §§ 1609.1, 1609.2); see also 29 CFR § 1604.11 (1993). But *we can say that whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances.* These *may include* the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. *But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.*

*Harris,* 510 U.S. at 22–23, 114 S.Ct. 367 (emphasis added). Thus, the Court recognized that determination of whether an environment is "hostile" or "abusive" requires consideration of "all the circumstances," then detailed what those circumstances "may include," clearly suggesting a non-exclusive list. *Id.* at 23, 114 S.Ct. 367. Moreover, the Court suggested that "any other relevant factor," such as psychological harm, should be considered. *Id.* In short, if the harasser's status can be shown to be a "relevant factor" in the context of "all the circumstances," the decision in *Harris* would appear to authorize, not bar, consideration of that factor.

While *Harris* provides implicit authority for consideration of the status of the harasser, this court has also found express recognition by certain judges or courts that harassment by a supervisor may reasonably be perceived to be, or may actually be perceived to be, different from harassment by a co-worker. The decisions showing such recognition warrant some scrutiny.

For example, Judge Tjoflat of the Eleventh Circuit Court of Appeals recognized, in a dissenting opinion, that in a case in which the alleged harasser was a co-worker, and not a supervisor, "the plaintiff likely experienced the conduct as less severe because she did not have to worry about complaining about a superior." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1266 (11th Cir.1999) (Tjoflat, J., dissenting). Thus, Judge Tjoflat recognized the relevance of the harasser's status to the "subjective" prong of the inquiry, which considers the plaintiff's perception of the harassment.

Similarly, a comparison by the Fourth Circuit Court of Appeals of a co-worker harassment case with a supervisor harassment case suggests that the court recognized an "objective" difference in the impact of the harassment based on the status of the harasser:

First Union relies heavily on *Hartsell [v. Duplex Prods., Inc.,* 123 F.3d 766 (4th Cir.1997),] in arguing that Scoggins' harassment was not severe or pervasive as a matter of law. First Union's attempt to link Scoggins' harassment of Smith to *Hartsell* is not convincing. The factors we must consider under *Harris [v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993),] establish that Scoggins' harassment of Smith was more severe and pervasive than what the plaintiff experienced in *Hartsell. The plaintiff in Hartsell was subjected to four isolated, nonthreatening remarks by coworkers during her tenure at Duplex. Conversely, in the present case, Scoggins, Smith's supervisor, subjected Smith to repeated remarks that belittled her because she was a woman.* Scoggins directed his insults at Smith on a regular basis; Scoggins made many of the remarks at least once a month when Smith worked at First Union.

*Smith v. First Union Nat'l Bank,* 202 F.3d 234, 242–43 (4th Cir.2000) (emphasis added) (footnotes omitted). Although it is not clear whether the distinction between the cases was based on the number or nature of incidents, the status of the harassers, or all of these factors, the court plainly considered the status of the harasser as pertinent to its analysis of whether the harassment was actionable.

Other courts have expressly recognized that harassment by a supervisor or other superior can have greater "objective" impact on the work environment than harassment by a co-worker. For example, the Seventh Circuit Court of Appeals has recognized repeatedly that "'a supervisor's use of [a racially derogatory term] impacts the work environment far more severely than use by co-equals.'" *Dandy v. United Parcel Serv., Inc.,* 388 F.3d 263, 271 (7th Cir.2004) (quoting *Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir.1993), but also recognizing "that in determining whether remarks 'objectively' create a hostile work environment we must assess the frequency of their use, as well as whether the remarks were stated directly to the plaintiff or whether the plaintiff heard them secondhand") (internal citations omitted); *Peters v. Renaissance Hotel Operating Co.,* 307 F.3d 535, 552 n. 14 (7th Cir.2002) (also quoting this statement from *Rodgers,* and noting that, in contrast, the offensive term had been used in that case only once and only by a co-worker, as opposed to a supervisor); *Rodgers,* 12 F.3d at 675 (source of the

quotation, noting that use of the offensive term by black employees did not mitigate the harm caused by a white supervisor's use of the term).

The United States District Court for New Jersey noted that "[t]he New Jersey courts have identified a somewhat more extensive list of factors [than appears in *Harris*, 510 U.S. at 23, 114 S.Ct. 367,] which may be relevant in determining whether a plaintiff has satisfied the objective 'severe or pervasive' standard," including "whether the alleged harasser was a co-worker or supervisor." *Hargrave v. County of Atlantic*, 262 F.Supp.2d 393, 414 n. 10 (D.N.J.2003) (citing *Baliko v. International Union of Operating Engineers, Local 825*, 322 N.J.Super. 261, 276, 730 A.2d 895 (App.Div.1999)).[5] The New Jersey Supreme Court did more than merely list such a factor, when it discussed the greater impact of racial harassment by a supervisor as opposed to a co-worker, in a case similar to Steck's, because it involved harassment of a sheriff's deputy by the county sheriff:

> Here, defendant did more than merely allow racial harassment to occur at the workplace, he perpetrated it. That circumstance, coupled with the stark racist meaning of the remark, immeasurably increased its severity. In *Rogers [v. Equal Employment Opportunity Comm'n*, 454 F.2d 234 (5th Cir.1971) (same), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)], the court noted that "a supervisor's use of [a racial slur] impacts the work environment far more severely than use by co-equals." 12 F.3d at 675. In *Nadeau [v.*

*Rainbow Rugs*, 675 A.2d 973, 976 (Me. 1996)], the court concluded that a single incident of sexual harassment by the highest-ranking employee of the company could reasonably be found "sufficiently severe to alter the conditions of employment and to create an abusive or hostile work environment." 675 A.2d at 974; *see also King v. Hillen*, 21 F.3d 1572, 1580 (Fed.Cir.1994) (noting the EEOC's Policy Guidelines on Sexual Harassment states that "consideration should be given to the type of conduct (verbal or physical), its frequency, its offensiveness, the hostility of the conduct, whether the harasser is a co-worker or a supervisor, and the number of persons at whom the harassment was directed" (emphasis added)); *cf. In re Seaman*, 133 N.J. 67, 94, 627 A.2d 106 (1993) (stressing that the sexual harassment by a judge directed to his law clerk was especially egregious because of the judge's authority and superior position).

The Sheriff of Burlington County is a high-ranking law enforcement officer. That fact is of significance when evaluating the effect of his remark on a subordinate. Any remark from such an individual carries with it the power and authority of the office. Because the sheriff was both plaintiff's superior and her offender, plaintiff could not seek the redress that would otherwise be available to a victim of invidious workplace harassment, namely, resort to her own supervisor. *See Radtke [v. Everett]*, 442 Mich. 368, 501 N.W.2d [155,] 168 [ (Mich.

<hr>

5. The only problem with this assertion is that the decision in *Baliko* does not list such a factor or otherwise suggest that it is relevant. *See Baliko*, 730 A.2d at 903–04. The New Jersey courts did, however, recognize such a factor elsewhere. *See Taylor v. Metzger*, 152 N.J. 490, 706 A.2d 685, 692 (1998); *T.L. v. Toys R Us, Inc.*, 255 N.J.Super. 616, 605 A.2d

1125, 1136 (App.Div.1992) (expressly identifying among pertinent factors for determining whether the environment was sufficiently "severe or pervasive" "whether the alleged harasser was a co-worker or a supervisor," citing EEOC Compliance Manual (CCH) § 615, ¶ 3114, C at 3274 (1990)).

1993) ] (stating that "because the perpetrator of the alleged [sexual harassment] was the employer, recourse to the employer was fruitless," and holding that "[t]he alleged conduct, combined with the reality that the employer was the perpetrator, permits [the] single incident to be sufficient to reach the jury"). Indeed, plaintiff's dilemma was acute and insoluble. She had nowhere to turn. When plaintiff did turn to defendant, she did not receive any redress or protection whatsoever, let alone comfort, solace or contrition. Rather, she was rebuffed and further agitated, to the point of tears, for taking offense to a remark that was clearly a slur against her race. *Taylor v. Metzger,* 152 N.J. 490, 706 A.2d 685, 692 (1998). This decision, in particular, highlights some of the reasons that harassment by a supervisor may be both "objectively" and "subjectively" more severe than harassment by a co-worker.

■ *iii. Additional considerations.* Notwithstanding that the Eighth Circuit Court of Appeals has apparently never authorized such a consideration, this court is persuaded that, for both the "objective" and "subjective" prongs of the inquiry, whether the harasser is a co-worker or supervisor (or successively higher official or manager) is relevant to the determination of whether a hostile work environment is sufficiently severe or pervasive to be actionable. Several reasons have led the court to this conclusion.

First, courts already recognize that harassment by a supervisor or successively higher official or manager is different from co-worker harassment for purposes of employer liability. *See, e.g., McCurdy,* 375 F.3d at 769 (citing *Ellerth,* 524 U.S. at 747–48, 118 S.Ct. 2257). As the Eighth Circuit Court of Appeals recently explained, "[t]he [Supreme] Court's rationale for holding employers vicariously liable for supervisor harassment result-

ing in a tangible employment action is straightforward: 'When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation.'" *Id.* (quoting *Ellerth,* 524 U.S. at 761–62, 118 S.Ct. 2257). Where, as here, there is no allegation that the supervisor's harassment led to a tangible employment action, "the Court observed the question of '[w]hether the agency relation aids in commission of supervisor harassment ... is less obvious,'" *id.* (quoting *Ellerth,* 524 U.S. at 763, 118 S.Ct. 2257), but neither the Supreme Court nor the Eighth Circuit Court of Appeals suggested that the "agency relation" did *not* aid in the commission of the harassment by the supervisor. Thus, if the possibility that the supervisor harasser was aided by the agency relation in commission of the harassment is relevant to *employer liability,* it follows that the possibility that the supervisor harasser was aided by the agency relation in the commission of the harassment should also be relevant to whether the harassment itself is *actionable.*

Second, in this court's view, whether or not harassment by a supervisor results in a tangible employment action, the supervisor's agency relation increases the impact of the harassment, from either an "objective" or "subjective" point of view, so that the harasser's status as either a co-worker or supervisor is a "relevant factor" in the mix of "all the circumstances." *See Harris,* 510 U.S. at 23, 114 S.Ct. 367 (authorizing consideration of "other relevant factors" as part of the "all circumstances" test of whether harassment was "severe or pervasive"). The Seventh Circuit Court of Appeals has expressly recognized that the use of racial epithets by a supervisor, objectively, has a more severe impact on the work environment than use of such words by co-workers. *See Dandy,* 388 F.3d at

271; *Peters,* 307 F.3d at 552 n. 14; *Rodgers,* 12 F.3d at 675. There is really no reasoned basis for supposing that the impact of supervisor harassment is less severe when the harassment is sexual rather than racial. Indeed, the New Jersey Supreme Court has expressly recognized that both racial and sexual harassment by a supervisor have a more severe impact than similar harassment by a co-worker. *See Taylor,* 706 A.2d at 691–92 (race discrimination by a supervisor); *In re Seaman,* 627 A.2d at 106 (sex discrimination of a law clerk by a judge). The New Jersey Supreme Court explained why: Such harassment is egregious, because of the judge's authority and superior position. *Taylor,* 706 A.2d at 692 (so explaining the reasoning in *Seaman*). As that court explained, "Any remark from such an individual carries with it the power and authority of the office." *Id.; cf. McCurdy,* 375 F.3d at 769 (explaining that the Supreme Court's rationale for a different analysis of employer liability when harassment was by a supervisor was that the employer could be aided by the agency relation in inflicting the harassment, citing *Ellerth,* 524 U.S. at 761–63, 118 S.Ct. 2257).

■ This court agrees with the Seventh Circuit Court of Appeals and the New Jersey Supreme Court. Where the harasser is a supervisor, the impact of the harassment is heightened: Harassment by a supervisor appears to carry the weight and imprimatur of the employer's authority and seems to authorize or condone like conduct by subordinates, thereby fostering a perception that the environment as a whole is hostile. Moreover, as the supervisor harasser is further removed from daily contact with the victim or as the supervisor harasser rises higher in the hierarchy, harassing incidents may become the most salient feature of the relationship between the harasser and the victim, even as they may become less frequent. That is, in fact, what Steck alleges happened

here, because she asserts that the harassing comments by Francis, infrequent as they were, embodied almost the whole of their direct communications over the years in question, although the defendants dispute that contention. Also, as Judge Tjoflat explained, from the "subjective" point of view, where the harasser is a co-worker, "the plaintiff likely experienced the conduct as less severe because she did not have to worry about complaining about a superior." *Mendoza,* 195 F.3d at 1266 (Tjoflat, J., dissenting). Thus, not only would a reasonable person in the victim's position perceive supervisor harassment to be more serious, but the victim herself or himself also perceives supervisor harassment to be more serious.

■ Third, from either an "objective" or "subjective" point of view, a victim is more vulnerable to supervisor harassment, so that the status of the harasser is, again, a "relevant factor" in the mix of "all the circumstances." *See Harris,* 510 U.S. at 23, 114 S.Ct. 367. The New Jersey Supreme Court also explored this "vulnerability" aspect of supervisor harassment, noting that, where a harasser enjoys a superior position, the "plaintiff could not seek the redress that would otherwise be available to the victim of invidious workplace harassment, namely, resort to her own supervisor." *Taylor,* 706 A.2d at 692 (noting, further, that attempting to seek recourse when the harasser *is* the employer would be "fruitless"). That court observed that, when the harasser is a supervisor, the victim is faced with a "dilemma [that is] acute and insoluble"; in other words, the victim has "nowhere to turn." *Id.*

This court suggests that victims are and are reasonably perceived to be more vulnerable to supervisor harassment, because when the harasser is a supervisor, the harasser may, and often does, find it easier

to target and harass the victim. For example, the harasser can control the circumstances under which the victim must be in his or her presence and can inflict retribution if the victim does not respond as desired. The victim could also find it harder, and could reasonably be thought to find it harder, to object to supervisor harassment, either to the harasser or through other channels. A victim of co-worker harassment often is, and is reasonably perceived to be, much more able to object to harassment to a co-worker's face, because the victim has less fear of personal, social, or professional consequences. *Cf. Mendoza*, 195 F.3d at 1266 (Tjoflat, J., dissenting) (noting that, when the harasser is a supervisor, the victim may have to "worry about complaining about a superior"). Any victim of supervisor harassment must also wonder whether an employer is more likely to believe the victim's or the supervisor's side of the story; whether the employer is more likely to perceive the value of the supervisor to the company to be greater than that of the victim, even if the employer believes the victim; and whether the employer is more likely to minimize the conduct of the harasser to prevent that conduct from reflecting badly on the employer. *Cf. id.* The victim may also perceive the employer to be much more likely to discipline or terminate a co-worker harasser, because such action would have fewer repercussions for the employer. Finally, the victim can more easily recognize and address conduct between co-workers as ordinary teasing, banter, or the rough and tumble of the workplace. *See, e.g., Kratzer*, 398 F.3d at 1047 (" 'Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace.' ") (quoting *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 967 (8th Cir.1999)); *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792–93 (" 'Sporadic use of abusive language, gender-related jokes, and occasional teasing are the ordinary tribulations of the workplace, and as such, they do not amount to actionable harassment.' ") (quoting *Breeding v. Arthur J. Gallagher and Co.*, 164 F.3d 1151, 1159 (8th Cir.1999)). Thus, the heightened objective and subjective perceptions of vulnerability of a victim to supervisor harassment also warrants consideration of the status of the harasser as a factor in determining whether the environment is actionable.

■ *iv. The proper calculus.* Because the status of the harasser as a supervisor or co-worker is likely to be relevant to the "objective" and "subjective" impact of harassment and to the "objective" and "subjective" perceptions of the victim's vulnerability, the court concludes that the status of the harasser is a "relevant factor" in the mix of "all the circumstances." *See Harris*, 510 U.S. at 23, 114 S.Ct. 367. This court suggests that the proper calculus is not only to include the harasser's status in the consideration of "all the circumstances," but to consider the harasser's status on a "sliding scale": As the harasser moves higher in the hierarchy of the employer, incidents of harassment become proportionally more severe. Such a calculus is appropriate, because the higher the harasser is in the employer's hierarchy, the more the harasser's status "carries with it the power and authority of the office," *i.e.*, the imprimatur of the employer. *Cf. Taylor*, 706 A.2d at 692 (the fact that the alleged harasser was "a high-ranking law enforcement officer," the county sheriff, the harasser's rank was "of significance when evaluating the effect of his remarks on a subordinate," because "[a]ny remark from such an individual carries with it the power and authority of the office," and citing *Radtke*, 501 N.W.2d at 168, as holding that, where the perpetrator was the employer, a single incident may be sufficient to reach a jury); *Dandy*, 388

F.3d at 271 (a supervisor's harassment is more severe than harassment by "co-equals"); *Peters,* 307 F.3d at 552 n. 14 (same); *Rodgers,* 12 F.3d at 675 (same). By the same token, as the harasser moves higher in the employer's hierarchy, the victim becomes proportionally more vulnerable to harassment by that harasser. *Cf. id.* (noting that, where the harasser is a superior, the plaintiff losses the opportunity to resort to her own supervisor to complain about invidious discrimination, and when the harasser is the employer, recourse to the employer is "fruitless"); *Mendoza,* 195 F.3d at 1266 (Tjoflat, J., dissenting) (suggesting that a plaintiff experiences harassment by a co-worker as less severe, because the victim does not have to worry about complaining about a superior). Therefore, the court will apply such a "sliding scale" analysis of the alleged harasser's conduct in this case.

### d. Determination in light of the harasser's status

█ Here, the parties agree that Francis, the alleged harasser, was the Acting Chief of Police at the time of the incidents in 2003 and was a superior officer at the time of the incidents in 2001, while Francis was a detective or patrol officer at the pertinent times. Consequently, because Francis was either a very high-ranking officer or the highest-ranking officer in the Department, Steck was left with few effective avenues for recourse from his harassment—indeed, she could not obtain any redress for the most egregious comments within the Department, or even from her union, and, instead, had to go outside the Department to register her complaint about Francis's conduct with the Mayor's Office. On the "sliding scale" postulated above, Francis's position in the Department magnifies the seriousness of any incidents of harassment by him, both in terms of the impact of the harassment and the vulnerability of the victim to it. With that

"magnification," the court will reassess whether the environment was sufficiently hostile to be actionable in light of "all the circumstances." *Harris,* 510 U.S. at 23, 114 S.Ct. 367; *see also Dandy,* 388 F.3d at 271 (even acknowledging that comments by a supervisor have more severe impact than comments by co-workers, the court must still consider the frequency of the comments and whether they were stated directly to the plaintiff).

Francis's comments to Steck remain offensive, immature, unprofessional, rude, and unpleasant, *see Kratzer,* 398 F.3d at 1047 (such comments are insufficient); *LeGrand,* 394 F.3d at 1101–02 (same), but now the court must take into account that those comments also bear the "power and authority" of the Department, at *Taylor,* 706 A.2d at 692, and have a more severe impact on the work environment, because of Francis's high-level or top-level position, *Dandy,* 388 F.3d at 271; *Peters,* 307 F.3d at 552 n. 14; *Rodgers,* 12 F.3d at 675, while Steck and a person in her situation were more vulnerable to those comments. *Taylor,* 706 A.2d at 692. Similarly, on the "sliding scale," the infrequency and isolation of only four incidents over approximately two years becomes less significant, as the comments begin to color not only Steck's relationship with one other officer, but with her highest superior, and by virtue of that officer's top-level position, the entire environment at the Department, as a person in Steck's position would perceive it, and as Steck asserts that she did, in fact, perceive it. While the court still has considerable doubt that the "are you pregnant?" and "protective vest" comments carry any sexually harassing inference, even where they were made by a person in a top-level position, that question is probably best left to a jury. On the other hand, the "nude shower videos" and "Ann Landers letter" comments become that much more serious when uttered by a person in

a top-level position directly to Steck, and where the "nude shower videos" comment was uttered in circumstances likely to increase Steck's humiliation, because the comment was made by a high-ranking officer in front of other male officers. *See Dandy*, 388 F.3d at 271 (the court should consider whether the supervisor's comments were made directly to the plaintiff). Thus, the fact that none of the conduct was physically threatening could also be considered by a reasonable jury to be of less significance. Finally, reviewing the record in the light most favorable to Steck, a reasonable jury could conclude that harassing comments by a person in a top-level position did not merely "upset" Steck, but that the upset and humiliation that she experienced as a result of the comments interfered with her work performance.

The defendants, nevertheless, contend that the environment was not "subjectively" hostile, because Steck acknowledged that the tension between her and Francis and within the Department as the result of her complaints is not "sexual." The court also notes that Francis's failure to complain to Francis or anyone else about the "are you pregnant?" comment suggests that she did not find that incident subjectively severe. On the other hand, Steck's pursuit of informal complaints about other incidents, to Captain Utley, the union representatives, and the Mayor's Office, all suggest that Steck did find the environment to which Francis's comments subjected her to be subjectively hostile. The fact that Steck may find that the tense atmosphere in the Department *after* her complaints is not "sexual" does not reasonably suggest that Steck did not find the comments on which complaints were based subjectively hostile at the time those comments were made.

Therefore, the court finds that Steck has generated genuine issues of material fact on the "subjectively hostile" prong as well as on the "objectively hostile" prong of the "actionable harassment" element of her hostile environment claim. Consequently, the defendants' motion for summary judgment on Steck's sexually hostile environment claim will be denied.

### C. Steck's Retaliation Claim

In addition to her hostile environment claim, Steck contends that she was retaliated against for complaining about sexual harassment in violation of state and federal law. The defendants have also moved for summary judgment on Steck's retaliation claims.

### 1. Arguments of the parties

The defendants launch a two-pronged attack on Steck's retaliation claim: They contend that most of the incidents on which Steck's retaliation claim relies did not result in a material change in her employment, while the rest of the incidents are supported by legitimate, non-retaliatory reasons. Somewhat more specifically, the defendants contend that Steck was not disciplined as the result of any of the purported investigations; Steck always had access to a vehicle and working radios; she ultimately was given Thanksgiving Day off as requested; the Mayor's question about "what she did" to cause Francis to make comments did not affect her employment or the progress of any investigation of her complaints; and the memorandum concerning access to the Mayor's Office was directed to everyone in the Department and did not prevent Steck from pursuing complaints through the Mayor's Office. The defendants contend that the remaining incidents are explained by legitimate, non-retaliatory reasons and that Steck has not rebutted those explanations. Specifically, they contend that Steck was not promoted to sergeant because she ranked only eighth out of eleven on the written test and ranked only sev-

enth out of eleven in the review board's rankings, when only three officers were promoted; Steck was not removed from the detective unit in retaliation for anything, because all but one detective, who had not been in the unit long, were rotated to patrol duty, because the Department determined that all officers should rotate through the various units to gain valuable experience, and Steck did not suffer any change in rank or pay as a result of the rotation; and, finally, the switch from eight-hour days to twelve-hour days was mandated by the collective bargaining agreement negotiated by the union.

Steck takes a very different view in her resistance to the defendants' motion for summary judgment. She contends, first, that the defendants have improperly asserted that she must show that explanations of allegedly retaliatory conduct are pretextual, but that the Supreme Court's decision in *Desert Palace v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), abrogated the *McDonnell Douglas* burden-shifting analysis. She also contends that such a burden-shifting analysis is not authorized by the statutory language of Title VII. She contends, further, that the record evidence is sufficient to demonstrate that she suffered retaliation for complaining about sexual harassment. She contends that the incidents in question did have a material impact on her employment, because she was passed over for promotion, and her job was made more difficult, for example, because she was the only officer not permanently assigned a police vehicle with a working attached radio, her hours and job assignment were changed, and the various investigations had a negative impact on her reputation and career and her relationships with others in the Department.

In reply, the defendants reassert the validity of the *McDonnell Douglas* burden-shifting analysis for retaliation claims.

They then reiterate their contention that Steck has failed to rebut their non-retaliatory reasons for purportedly retaliatory actions.

### 2. Analysis

#### a. Continued viability of the burden-shifting analysis

 The Eighth Circuit Court of Appeals recently reiterated that, post-*Desert Palace*, the courts must still apply the *McDonnell Douglas* three-part burden-shifting analysis to retaliation claims. *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1017–18 (8th Cir.2005) (holding that *Desert Palace* had no impact on the applicability of the burden-shifting analysis to either retaliation or discrimination claims); *see also Eliserio*, 398 F.3d at 1078 (applying the burden-shifting analysis to a retaliation claim); *Kratzer*, 398 F.3d at 1048 (same). Thus, "[t]o make a prima facie case of retaliation against an employer, a claimant must show that (1) he engaged in protected conduct by either opposing an act of discrimination made unlawful by Title VII or participating in an investigation under Title VII; (2) he suffered an adverse employment action; and (3) the adverse action was causally linked to the protected conduct." *Id.* at 1078–79; *Kratzer*, 398 F.3d at 1048; *accord Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1035 (8th Cir.2005) ("To state a retaliation claim, a plaintiff must show that she (1) engaged in a protected activity, (2) that she suffered an adverse employment action, and (3) that the two events are causally connected."). If the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the employer to offer a non-retaliatory reason for alleged retaliation, and if the employer does so, the plaintiff must show that the proffered reason is a pretext for retaliation. *Id.* at 1079–80; *Kratzer*, 398 F.3d at

1048 ("Once the prima facie case is made, [the employer] must articulate a legitimate, nondiscriminatory reason for its actions," and if the employer does so, then "[t]he burden shifts to [the employee] to establish that the alleged legitimate, nondiscriminatory reason for [adverse action] was a pretext."). As to pretext, the question is whether a reasonable jury could find the defendant's explanation to be a mere pretext for retaliation in light of the evidence presented. *Id.*

#### b. First-stage challenges

■ In their summary judgment motion, the defendants expressly challenge only the second element of Steck's *prima facie* case, "adverse employment action," and then as to only certain incidents upon which Steck's retaliation claim relies. "Adverse employment action" consists of such things as a diminution of pay or benefits, or an adverse change in working conditions. *Pedroza v. Cintas Corp. No. 2,* 397 F.3d 1063, 1071 (8th Cir.2005) (the plaintiff's retaliation claim failed because she failed to show any such "adverse employment action" as the result of her protected activity); *Okruhlik v. University of Arkansas,* 395 F.3d 872, 879 (8th Cir.2005) ("A plaintiff suffers an adverse employment action when the action results in a 'material employment disadvantage' such as '[t]ermination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects.'") (quoting *Duncan v. Delta Consol. Indus.,* 371 F.3d 1020, 1026 (8th Cir.2004), in turn quoting *Spears v. Missouri Dep't of Corrections & Human Res.,* 210 F.3d 850, 853 (8th Cir.2000)). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Tademe v. Saint Cloud State Univ.,* 328 F.3d 982, 992 (8th Cir.2003).

■ The court concludes that Steck has not shown that several of the purportedly retaliatory incidents constituted "adverse employment action." Specifically, Steck was not disciplined as the result of any of the purported investigations; Steck ultimately was given Thanksgiving Day off as requested; the Mayor's question about "what she did" to cause Francis to make comments did not affect her employment or the progress or outcome of any investigation of her complaints; and the memorandum concerning access to the Mayor's Office was directed to everyone in the Department and did not prevent Steck from pursuing complaints through the Mayor's Office. To put it another way, none of these incidents resulted in a material change in Steck's pay, responsibilities, or working assignments. *Pedroza,* 397 F.3d at 1071; *Okruhlik,* 395 F.3d at 879. Therefore, the defendants are entitled to summary judgment on Steck's retaliation claim to the extent that the retaliation claim relies on any of these incidents.

■ However, contrary to the defendants' contentions, the court finds that Steck has generated a genuine issue of material fact that she was deprived of regular access to an adequate police vehicle with an adequate radio and that such deprivation materially and adversely affected her ability to perform her job. *Id.* For example, Steck has pointed to evidence that she could not always obtain prompt access to a vehicle, that the vehicle available was not always readily recognizable as a police vehicle, which caused her some difficulties in executing police duties with members of the public, and that she sometimes had difficulty obtaining a working radio or calling for backup without one, which may constitute a serious threat to officer safety or effective execution of an officer's duties. Therefore, Steck's retaliation claim may proceed on the basis of retaliatory denial of access to an adequate vehicle and adequate radios, unless those

incidents fail some other part of the burden-shifting analysis.

### c. Third-stage challenges

■ The defendants make only third-stage challenges to the remaining incidents of purported retaliation, assuming that they are sufficiently "adverse," contending that Steck has failed to rebut the legitimate, non-retaliatory reasons that the defendants have put forward for the actions in question. The court agrees that no reasonable jury could find, on the record presented, that Steck has established that the defendants' explanations for the remaining actions are a pretext for retaliation. *Eliserio*, 398 F.3d at 1079–80 (applying this standard).

■ Specifically, Steck cannot refute the defendants' proffered legitimate reasons for denying her application for promotion to sergeant. Steck cannot refute that she placed eighth out of eleven on the written test for promotion to sergeant and was rated only seventh out of eleven by the review board, when only three officers were promoted. Her vague contentions that the review board members were biased against her because of her complaints about harassment are simply insufficient to generate a jury question where her placement by the review board correlates with her placement after the written test. This conclusion is not changed by evidence that the officer who ranked seventh on the written test was ultimately promoted, because his much greater experience reasonably justified his higher ranking by the review board. Steck must do more than disagree with the defendants' proffered legitimate reason, or show that the reason is arguably a poor one; instead, she must point to some basis for finding that the reason is a pretext *for retaliation,* which is what is missing here. *See Strate*, 398 F.3d at 1017 (in the context of the burden-shifting analysis, "pretext" or "pretextual"

"must be read as shorthand for indicating that a defendant's proffered [non]discriminatory explanation for adverse employment action is a pretext *for unlawful discrimination,* not that it is merely false in some way.") (emphasis in the original). Similarly, Steck has failed to rebut the defendants' explanation that all of the officers in the detective unit but one, who had not been in the unit very long, were rotated to other units under a new program to give all officers experience with the various units. Steck simply was not the sole target of reassignment. Nor has Steck rebutted the defendants' explanation that *all* officers were placed on twelve-hour shifts pursuant to the collective bargaining agreement by asserting that she had initially been allowed to work shorter days because her supervisor thought it would be better if she worked more but shorter days. Again, Steck was not the sole target of the twelve-hour-day requirement and the fact that she did not get the special exemption that she wanted from that requirement is not retaliatory, where she cannot show that such exemptions were routinely granted or otherwise show that the hours change was a pretext *for retaliation.* Therefore, the defendants are entitled to summary judgment on Steck's retaliation claim to the extent that it relies on these incidents.

### d. Summary

In light of the foregoing, Steck's retaliation claim survives summary judgment only to the extent that there is a jury question as to whether Steck's vehicle and radio assignments were retaliatory. The defendants are entitled to summary judgment on the remainder of Steck's retaliation claim.

## III. CONCLUSION

Contrary to the defendants' contentions, Steck has generated genuine issues of ma-

terial fact that her hostile environment claim is actionable, because it does involve sufficiently severe or pervasive sexual harassment when the status of the harasser as a top-level official in the Department is properly considered as a "relevant factor" among "all the circumstances" of the claim. *See Harris,* 510 U.S. at 23, 114 S.Ct. 367 (authorizing consideration of all "relevant factors" in the consideration of "all the circumstances," and identifying only a non-exclusive list of such factors). On the "sliding scale" postulated by the court, Francis's top-level position substantially magnifies the severity of the impact of the incidents, while proportionally increasing the victim's vulnerability to that harassment, from both an "objective" and a "subjective" perspective. On the other hand, Steck has not generated genuine issues of material fact that her retaliation claim can go forward on the basis of any of the allegedly retaliatory incidents except to the extent that the retaliation claim is premised on retaliatory vehicle and radio assignments.

THEREFORE, the defendants' January 26, 2005, Motion For Summary Judgment (docket no. 9) is **granted in part and denied in part**, as follows:

1. The motion is **denied** as to the hostile environment harassment claims pursuant to Title VII and the ICRA in Steck's First and Second Causes of Action; and

2. The motion is **denied** as to the retaliation claim pursuant to Title VII and the ICRA in Steck's Third Cause of Action to the extent that the claim alleges retaliatory vehicle and radio assignments, but **granted** as to the remainder of Steck's retaliation claim.

IT IS SO ORDERED.